v. Agostini

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2009

(Argued: January 11, 2010        Decided: July 23, 2010)

Docket No. 09-0462

_____

ANTHONY MANGANIELLO,

Plaintiff-Appellee,

- v. -

THE CITY OF NEW YORK, SHAWN ABATE, individually and as a New York City Police Detective, DEREK PARKER, individually and as a New York City Police Detective, HENRY SCOTT, individually and as a New York City Police Lieutenant, ALEX PEREZ, individually and as a New York City Police Officer, MIRIAN NIEVES, individually and as a New York City Police Officer, MICHAEL PHIPPS, individually and as the Commanding Officer of the 43rd Precinct, JOHN McGOVERN, individually and as a New York City Police Detective Sergeant, ROBERT MARTINEZ, individually and as a New York City Police Officer, GERYL McCARTHY, individually and as a New York City Police Deputy Inspector,

Defendants,

LUIS AGOSTINI, individually and as a New York City Police Detective,

Defendant-Appellant.

_____

Before:  KEARSE and CABRANES, Circuit Judges, and EATON, Judge[*].

_____

*  Honorable Richard K. Eaton, of the United States Court of International Trade, sitting by designation.

Appeal from a judgment of the United States District Court for the Southern District of New York, Harold Baer, Jr., Judge, following a jury verdict awarding plaintiff $1,426,261 in compensatory damages, plus $75,000 in punitive damages, on claim brought under 42 U.S.C. § 1983 for malicious prosecution. See Manganiello v. Agostini, No. 07 Civ. 3644, 2008 WL 5159776 (S.D.N.Y. Dec. 9, 2008).

Affirmed.

> MICHAEL H. JOSEPH, White Plains, New York (Osorio & Associates, White Plains, New York, on the brief), for Plaintiff-Appellee.
>
> VICTORIA SCALZO, Assistant Corporation Counsel, New York, New York (Michael A. Cardozo, Corporation Counsel of the City of New York, Stephen J. McGrath, Amy Okereke, New York, New York, on the brief), for Defendant-Appellant.

KEARSE, Circuit Judge:

Defendant Luis Agostini, a former detective in the New York City ("City") Police Department ("NYPD"), appeals from a judgment entered in the United States District Court for the Southern District of New York following a jury trial before Harold Baer, Jr., Judge, ordering Agostini to pay plaintiff Anthony Manganiello, who had been acquitted of charges of murder, $1,426,261 in compensatory damages, $75,000 in punitive damages, and $215,037.50 in attorneys' fees, on Manganiello's claim, brought under 42 U.S.C. § 1983, for malicious prosecution. On appeal, Agostini contends principally that the district court

should have granted him judgment as a matter of law on the ground (a) that the malicious prosecution claim was foreclosed by the existence--or presumed existence arising from a grand jury indictment--of probable cause for Manganiello's prosecution, or (b) that Agostini is entitled to qualified immunity on the basis that it was objectively reasonable for him to believe that probable cause existed. Alternatively, Agostini contends that he should be granted a new trial because the jury's verdict was excessive or because there were various alleged errors in the district judge's rulings, instructions, questions, and comments at trial. For the reasons that follow, we affirm the judgment of the district court.

## I. BACKGROUND

The present case had its inception in the February 12, 2001 fatal shooting of Albert Acosta at the Parkchester South Condominiums (the "Parkchester") in the Bronx, New York. Agostini was the NYPD detective in charge of the murder investigation. Acosta and Manganiello were special patrol officers who had been on duty at the Parkchester on February 12. Manganiello was promptly arrested for the murder but was released less than 24 hours later for lack of probable cause. He was rearrested on April 20, 2001, and was tried in 2004 on charges of second-degree murder and other related charges; he was acquitted on all counts.

After he was acquitted, Manganiello commenced the present action under 42 U.S.C. § 1983 against Agostini and nine other individuals who at pertinent times were members of NYPD involved in investigating the Acosta murder, as well as against the City, for malicious prosecution. The district court granted summary judgment dismissing Manganiello's claims against the City and five of the individual defendants but allowed his claims against Agostini, NYPD Detective Shawn Abate, and three other defendants to proceed to trial. See Manganiello v. City of New York, No. 07 Civ. 3644, 2008 WL 2358922 (S.D.N.Y. June 10, 2008) ("Manganiello I"). At trial, the jury, on a detailed verdict sheet, found that only Agostini and Abate had been proven to have maliciously prosecuted Manganiello. (See Verdict Sheet ¶ 1.) In addition, asked, with respect to each defendant separately, whether Manganiello had

> proved by a preponderance of the evidence that (A) the Defendant misrepresented the evidence to the prosecutors, or failed to provide the prosecutor with material evidence or information, or gave testimony to the Grand Jury that was false or contained material omissions, **and** (B) the Defendant knew that he . . . was making a material misrepresentation or omission or giving false testimony,

(Verdict Sheet ¶ 2 (emphasis in original)), the jury answered "NO" with respect to Abate and "YES" with respect to Agostini (id.).

In light of the jury's findings with respect to Abate, the district court granted a motion to dismiss the claim against him on the ground of qualified immunity. (See Trial Transcript ("Tr.") 839.) Thereafter, in an Opinion and Order dated December 9, 2008, Manganiello v. Agostini, No. 07 Civ. 3644, 2008 WL

- 4 -

5159776 (S.D.N.Y. Dec. 9, 2008) ("Manganiello II"), the court denied motions by Agostini (1) pursuant to Fed. R. Civ. P. 50 for judgment as a matter of law on the ground of qualified immunity or lack of proof of the elements of a malicious prosecution claim, and (2) in the alternative, pursuant to Fed. R. Civ. P. 59, for a new trial on the ground that the district judge committed various errors during the trial, see Part III below.

The following description summarizing the events preceding Manganiello's acquittals--which are described more fully by the district court in Manganiello II, 2008 WL 5159776, at *3-*5--is based on the evidence presented at trial in the present action, taken in the light most favorable to Manganiello as the party against whom Agostini sought judgment as a matter of law.

A. Agostini's Investigation and the Charges Against Manganiello

On February 12, 2001, Acosta and Manganiello, on the 8 a.m. to 4 p.m. shift, were assigned to patrol, separately, areas in the eastern quadrant of the Parkchester, which included the building at 1700 Metropolitan Avenue ("1700 Metropolitan"). At about 10:15 a.m., the Parkchester security office sent a message over the security radio system stating that there was a "1013"-- meaning an "officer down"--in the basement of 1700 Metropolitan. Manganiello, who had been on his way to a diner for a coffee break, raced to the scene, where numerous police cars had already arrived. Manganiello entered the basement and saw the bleeding body of Acosta. When NYPD crime scene investigators arrived,

- 5 -

Manganiello left the building, but he was quickly stopped by NYPD Officer Miriam Nieves, who grabbed his hands and started sniffing them. Nieves and other officers asked Manganiello to come to the police station to help with the investigation. Manganiello agreed.

Upon arriving at the station, Manganiello was placed in an interrogation room where he was questioned by Agostini. Agostini asked whether Manganiello knew of anyone who had animosity toward Acosta, and Manganiello described an incident in which Acosta had been assaulted by members of the Bloods gang, and another in which local thugs had threatened to shoot Acosta. Agostini then asked whether Manganiello had killed Acosta. Manganiello testified that when he responded that he had had nothing to do with it, Agostini "stands up, pissed off and he's looking at me like a piece of garbage." (Tr. 68.) Agostini then called in two other detectives, and they strip-searched Manganiello--with Agostini even ripping a Band-Aid from Manganiello's finger. Manganiello was photographed, had his hands swabbed, and was placed in a cell. Manganiello had been left wearing only his pants and a tank top, and he asked to have more of his clothes returned because the cell was cold; Agostini just laughed at him.

No gunshot residue was found on Manganiello's hands, and Agostini was instructed by his supervisors that there was no probable cause for Manganiello's arrest. Manganiello was released at 5 a.m. the next morning. He was given back his clothing, but

- 6 -

Agostini, shoving him toward the exit, refused to allow him to put the laces in his shoes before leaving the station house.

Agostini never followed up on the information given to him by Manganiello as to persons who had previously threatened or assaulted Acosta. Nor did he pass that information to the assistant district attorney in charge of the case (the "ADA").

Two days after the shooting, however, Agostini met with Terrence Alston, a member of the Bloods gang who had been in jail since some four months before the Acosta shooting but who claimed to have relevant information. Alston told Agostini that Manganiello had tried to hire Alston to kill a Parkchester security guard. (Manganiello testified in the present case that he had never met or spoken with Alston.) Alston also told Agostini that a friend named Johnny Baker had sold Manganiello a .22 caliber gun--the caliber of the gun used to shoot Acosta. When Agostini interviewed Baker, however, Baker credibly told Agostini that Alston had lied. When Agostini confronted Alston about this lie, Alston became angry and told Agostini not to interview witnesses produced by Alston unless Alston was present. Alston promised that if he were released from jail, he would, within four weeks, produce another witness for Agostini. Agostini viewed Alston as "playing games" to get out of jail (Tr. 256 (internal quotation marks omitted)), but he testified at trial in the present case that it did not occur to him that Alston might be planning to intimidate prospective witnesses when Alston said

- 7 -

Agostini was not to interview them in Alston's absence (see id. at 252).

Approximately two weeks after the homicide, Agostini received information from a taxi driver who reported overhearing a passenger, Alfred Vasquez, say on a cell phone that Vasquez had seen a security officer get shot and was the only one who had seen the shooter. Agostini located and questioned Vasquez, who said that although he had made such a statement, it was simply a fabrication. Agostini accepted Vasquez's response without making any further inquiries, apparently neither confirming Vasquez's whereabouts at the time of the shooting nor having Vasquez's fingerprints compared against those found at the scene.

On March 1, 2001, Agostini created a document that suggested that when Acosta was shot at 1700 Metropolitan, Manganiello was in the building. It is undisputed that, earlier on the morning of the shooting, Manganiello had responded to a call reporting a disturbance in that building. Three members of NYPD, including Officers Eric Rodriguez and [FNU] Ortiz, had also responded. Rodriguez and Ortiz were interviewed, on the night of the shooting, by NYPD Detective Richard E. Martinez, who reported in an NYPD Follow-Up form--known as a "DD5"--that Rodriguez and Ortiz stated that Manganiello left the building with them. In Agostini's March 1 DD5, Agostini said that no one had seen Manganiello leave the building.

Some two weeks after Agostini discovered that Alston had lied to him about Johnny Baker, Agostini and Martinez approached

- 8 -

one Michael Booth, knowing that Booth was engaged in the unlawful activities of bookmaking and/or loan sharking. Agostini said he had information that a Parkchester security officer had tried to buy a gun from Booth. Booth at first refused to endorse that information; but Agostini and Martinez took him to the police station, searched him, and found a knife and betting slips bearing names and monetary amounts in his pockets. Agostini threatened to report Booth to the NYPD organized crime bureau. Only then did Booth agree to sign a statement to the effect that Manganiello had tried to buy a gun from him. (Manganiello testified at trial in the present case that he had never had such a conversation with Booth.)

After Booth signed the statement, the detectives gave him back his knife, and he left the police station. No charges were filed against him; the gambling slips were placed in the Acosta murder case file maintained by Agostini--which later disappeared-- and Booth's name was not given to the organized crime bureau. Agostini gave Booth's statement to the ADA, who ultimately called Booth as a witness at the murder trial to testify that Manganiello had tried to buy a gun from him. In the present case, the ADA testified that she had not authorized Agostini or anyone else to withhold criminal charges against Booth in exchange for implicating Manganiello. (See Tr. 638.)

With respect to Alston, Agostini testified that he did not note in any of his DD5s his belief that Alston was playing games or that Alston wanted to be present when witnesses Alston

- 9 -

produced were interviewed; nor did he mention to the district attorney's office Alston's insistence on being present at such interviews. The ADA, who testified that Agostini did not raise any concerns with her that, in order to get out of jail, Alston was "making up stories" (Tr. 647), arranged for Alston's release from jail "in exchange for his testimony against [Manganiello]" (id.). On April 5, 2001, after his release, Alston produced a teenager, Mark Damon, who told Agostini and the ADA that, in January 2001, Damon had sold Manganiello a gun. (Manganiello testified in the present case that he had not bought a gun from anyone in January 2001 and had never met Damon.) Agostini testified in the present case that he "knew that Alston had provided [him with] false information," and he "didn't know whether [Alston] was believable or not believable." (Id. at 247.) Agostini said, "He gave me false information . . . once, but then he gave me the right information . . . the second time." (Id. at 248.)

The information given "the second time" also proved to be false. Prior to Manganiello's trial in 2004, Alston died, and Damon recanted his statement that he had sold Manganiello a gun. At trial in the present case, Agostini admitted that Alston had "asked Damon to lie about Anthony Manganiello." (Id. at 330; see also id. at 261 (Damon, in recanting, said "Alston[ had] made him say it.") (internal quotation marks omitted).)

In the meantime, on April 20, 2001, Manganiello was arrested on a felony complaint signed by Agostini. On May 7,

2001, following testimony from Agostini, Alston, and several other witnesses, the grand jury indicted Manganiello on two counts of murder in the second degree and one count each of manslaughter and criminal possession of a weapon.

Thereafter, the case file on the Acosta murder disappeared. It had contained, inter alia, handwritten notes by detectives of their interviews, including some that might have contradicted the grand jury testimony of certain witnesses. For example, one such witness was Walter Cobb, a porter at 1700 Metropolitan. Before the grand jury, Cobb testified that he was outside the building on the morning of February 12, 2001, when he heard shots, and that "almost immediately" (Tr. 93 (internal quotation marks omitted)), as he was about to unlock the basement door, it "flew open" (id. (internal quotation marks omitted)) and Manganiello came out. That testimony was partially inconsistent with a DD5 prepared by Detective Martinez based on his interview of Cobb, in that Cobb told Martinez he did not have a key for the basement door; and it apparently differed in a more important respect from statements Cobb had made to NYPD Officer Alex Perez shortly after the shooting. Perez had responded to the "officer down" radio call; and after briefly canvassing the basement, he had gone outside and encountered Cobb, who described hearing gunshots. Cobb told Perez he saw Manganiello "five minutes" after hearing the gunshots. (Id. at 521-22.) Perez himself was interviewed that evening by Martinez, and Perez did not tell Martinez that Cobb had seen Manganiello leaving the basement.

(See id. at 526-27.) Thus, Martinez testified that according to his DD5 on his interview of Perez, which Martinez gave to Agostini along with his handwritten notes of the interview, "Cobb didn't say anything to Officer Perez about Mr. Manganiello coming out of a basement door." (Id. at 403.)

Agostini apparently did not call the discrepancies in Cobb's statements, e.g., as to where and when Cobb first saw Manganiello after the shooting, to the attention of the ADA. Although the ADA testified at trial in the present case that, before calling Cobb to the grand jury, she had been informed "about all of Mr. Cobb's statements" (id. at 622), her prior deposition testimony was that she did not recall being made aware of a number of discrepancies in the statements Cobb made to various officers, including that Cobb originally did not say he saw Manganiello exit the basement seconds after he heard the shots (id. at 623-24).

Agostini, as the lead detective on the Acosta homicide, had responsibility for maintaining all the reports and evidence produced during the investigation and securing them for trial. When detectives completed their DD5s, they gave them to Agostini, along with their handwritten notes of their interviews. The notes were to be maintained in the case file in order to preserve the ability of the accused to cross-examine the witnesses at trial. In the present case, the DD5s were photocopied by the district attorney's office, which maintained copies and returned the originals to Agostini. Those originals, along with all of the

handwritten notes, the arrest report, the results of the gunshot residue tests, and everything else in the case file (including Booth's incriminating betting slips), disappeared prior to Manganiello's trial.

At various times Agostini gave conflicting testimony about, inter alia, where he had stored the case file before it disappeared. In a deposition in the present case, he testified that he had last left the box under his desk; at trial in the present case, he testified he had last left it on top of a locker in the detectives' locker room.

In addition, Agostini testified that he had at one point given the entire case file to the ADA. This was contradicted both by Agostini's testimony at a pretrial hearing in the criminal case that he had not given the ADA his handwritten notes, and by the testimony of the ADA at trial in the present case. The ADA testified that she had represented to the trial judge in the criminal case that she never had possession of the homicide case file. When she asked for the file, it had disappeared. The ADA also testified that Agostini did not give her copies of the handwritten interview and investigative notes. Thus, in the criminal case--as in the present case--Manganiello was not able to obtain some of the investigative materials to which he was entitled.

One document that was not lost was a note that Agostini had found in a search of Manganiello's locker at the Parkchester. At a pretrial hearing in the criminal case, Agostini testified

- 13 -

that Manganiello's note said "I feel like killing somebody." The note actually said, "I pray every day I will never have to kill someone." (Tr. 266-67.)

The jury in the criminal case found Manganiello not guilty on all counts.

B. The Denial of Agostini's Motion for Judgment as a Matter of Law

As indicated above, the jury in the present case, to the extent pertinent to this appeal, found Agostini liable to Manganiello for malicious prosecution and found that Agostini "misrepresented the evidence to the prosecutors, or failed to provide the prosecutor with material evidence or information, or gave testimony to the Grand Jury that was false or contained material omissions, **and** . . . knew that he . . . was making a material misrepresentation or omission or giving false testimony" (Verdict Sheet ¶ 2 (emphasis in original)). The jury found Manganiello entitled to compensatory damages totaling $1,426,261. Although the jury found that Abate was responsible for 10 percent of that amount, the district court ruled that Abate was entitled to qualified immunity because the jury found that he either had not made false statements or misrepresentations, etc., or, if he had, that he had not done so knowingly. The court also ruled that, in light of the joint and several liability imposed on joint tortfeasors, Agostini is liable to Manganiello for the entire $1,426,261.

- 14 -

In connection with its initial verdict, the jury was also asked to decide whether punitive damages were appropriate, although not to determine an amount. It responded affirmatively. After Abate was dismissed from the case on the ground of qualified immunity, the jury was reconvened and heard argument on the question of the amount of punitive damages Agostini (in his individual capacity) should pay. It determined that that amount was $75,000.

Following the jury's initial verdict, Agostini had moved for judgment as a matter of law, arguing principally that one element of a claim of malicious prosecution is that probable cause for the prosecution was lacking; that a grand jury indictment creates a presumption that probable cause existed; and that Manganiello failed to present evidence of fraud, perjury, or other misconduct on the part of Agostini that could demonstrate that the grand jury's indictment was the result of bad-faith police conduct sufficient to rebut that presumption. Agostini also argued that Manganiello failed to present sufficient evidence of two other elements of a malicious prosecution claim, i.e., that Agostini was responsible for the initiation of the criminal case or that he had acted with malice. Alternatively, Agostini sought judgment as a matter of law on the ground that he was entitled to qualified immunity.

In an exhaustive discussion in Manganiello II, thoroughly annotated with citations to the trial transcript, the district court rejected each of Agostini's contentions and denied the

motion. Based principally on the evidence described in Part I.A. above, the court found that "Manganiello provided enough evidence at trial that a reasonable juror could conclude that Agostini . . . failed to make a complete and full statement of facts to the District Attorney, misrepresented or falsified evidence, withheld evidence or otherwise acted in bad faith." Manganiello II, 2008 WL 5159776, at *2 (internal quotation marks omitted). The Court concluded that the jury reasonably found that Manganiello had "successfully rebutted the presumption of probable cause that was created by the grand jury indictment." Id. at *5. The district court ruled that that evidence was also sufficient to permit the jury to find that probable cause was actually lacking.

The court found that there was likewise sufficient evidence of the other elements of a malicious prosecution claim. It found that "there was enough evidence for the jury to reasonably conclude that Agostini commenced or initiated the criminal prosecution" because he "provided the District Attorney's office with all the information that led to the authorization for Manganiello's arrest" and "signed the felony complaint." Id. at *6. As to malice, the court noted that "'[m]alice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff,'" id. at *7 (quoting Pinsky v. Duncan, 79 F.3d 306, 313 (2d Cir. 1996)). It found that the jury could have found malice on the part of Agostini from the lack of probable cause, see Manganiello II, 2008 WL 5159776, at *7, as well as from

- 16 -

Agostini's harsh treatment of Manganiello at the time of his initial arrest and Agostini's evident pique at being instructed to release Manganiello at that time, see id. at *10-*11.

With respect to Agostini's motion for judgment as a matter of law on the ground of qualified immunity, the district court again noted the jury's findings that Agostini had misrepresented the evidence to prosecutors, or had withheld material evidence or information from the prosecutor, or had given testimony to the grand jury that was false or materially misleading "and knew that he was making a material misrepresentation or omission or giving false testimony," Manganiello II, 2008 WL 5159776, at *8 (emphasis in original). The court concluded that, in light of these facts, "it would not have been objectively reasonable for Agostini to believe that his actions or omissions" did not violate Manganiello's "clearly established constitutional rights. Put another way, there could be no disagreement among officers of reasonable competence that [Agostini's] conduct was unlawful." Id.

Agostini also moved, in the alternative, for a new trial on various grounds. As discussed in Part III below, the district court denied that motion as well.

On appeal, Agostini pursues his contentions that he was entitled to judgment as a matter of law on the grounds of qualified immunity or insufficient evidence to prove the claim of malicious prosecution, and, alternatively, that he is entitled to

a new trial. For the reasons that follow, we find none of his contentions persuasive.

## II. THE DENIAL OF JUDGMENT AS A MATTER OF LAW

In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, see, e.g., Murphy v. Lynn, 118 F.3d 938, 944 (2d Cir. 1997), cert. denied, 522 U.S. 1115 (1998); Rohman v. New York City Transit Authority, 215 F.3d 208, 215 (2d Cir. 2000), and must establish the elements of a malicious prosecution claim under state law, see, e.g., Murphy v. Lynn, 118 F.3d at 944; Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995); Janetka v. Dabe, 892 F.2d 187, 189 (2d Cir. 1989). To establish a malicious prosecution claim under New York law, a plaintiff must prove "'(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" Murphy v. Lynn, 118 F.3d at 947 (quoting Russell v. Smith, 68 F.3d at 36); see Broughton v. State, 37 N.Y.2d 451, 457, 373 N.Y.S.2d 87, 94, cert. denied, 423 U.S. 929 (1975).

In considering a motion for judgment as a matter of law, the district court

"must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility

- 18 -

determinations or weigh the evidence . . . . Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . Thus, although the court should review the record as a whole, _it must disregard all evidence favorable to the moving party that the jury is not required to believe_."

_Zellner v. Summerlin_, 494 F.3d 344, 370 (2d Cir. 2007) ("_Zellner_") (quoting _Reeves v. Sanderson Plumbing_, 530 U.S. 133, 150-51 (2000) (other internal quotation marks omitted) (emphases in _Zellner_)). We review a district court's denial of a motion for judgment as a matter of law _de novo_. "In so doing, we apply the same standard[s] that [are] required of the district court." _Zellner_, 494 F.3d at 371. Under these standards, Agostini plainly was not entitled to judgment as a matter of law.

## A. Probable Cause

Although the existence of probable cause must be determined with reference to the facts of each case, in general "[p]robable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." _Zellner_, 494 F.3d at 368 (citing, _e.g._, _Dunaway v. New York_, 442 U.S. 200, 208 n.9 (1979); _Wong Sun v. United States_, 371 U.S. 471, 479 (1963); _Brinegar v. United States_, 338 U.S. 160, 175-76 (1949)). Probable cause may also exist where the officer has relied on mistaken information, so long as it was reasonable for him to rely on it.

- 19 -

See, e.g., Hill v. California, 401 U.S. 797, 803-04 (1971). However, "the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause." Colon v. City of New York, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 (1983). The existence of probable cause must be determined by reference to the totality of the circumstances. See, e.g., Illinois v. Gates, 462 U.S. 213, 238 (1983).

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York," Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003), and "indictment by a grand jury creates a presumption of probable cause," id. That presumption may be rebutted only "by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" Id. (quoting Colon v. City of New York, 60 N.Y.2d at 83, 468 N.Y.S.2d at 456). Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have "lied in order to secure an indictment," and "a jury could reasonably find that the indictment was secured through bad faith or perjury," the presumption of probable cause created by the indictment may be overcome. Boyd v. City of New York, 336 F.3d 72, 77 (2d Cir. 2003). "Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.'" Ricciuti v. N.Y.C. Transit Authority, 124

- 20 -

F.3d 123, 130 (2d Cir. 1997) ("Ricciuti") (quoting United States v. Agurs, 427 U.S. 97, 104 (1976)).

As set out in Part I above, the jury in the present case found that Agostini had engaged in at least one of those forms of misconduct and had done so knowingly. We see no error in the district court's ruling that there was ample evidence to support the jury's findings. The evidence described above included, for example, Agostini's misrepresentation in one of his DD5s that, after Manganiello responded to a report of a disturbance at 1700 Metropolitan on February 12, 2001, prior to the shooting of Acosta in the basement of that building, no one had seen Manganiello leave the building. In fact, a DD5 prepared by Martinez, and given to Agostini as leader of the investigative team, reported that two NYPD officers who had also responded to that disturbance stated that Manganiello left the building with them.

In addition, although there was evidence that Manganiello had informed Agostini of two prior instances in which Acosta had been assaulted or threatened by members of the Bloods or by other local thugs, Agostini's DD5 on his interrogation of Manganiello stated that when he asked Manganiello "if anyone he knows has any problems with" Acosta, "Manganiello would not answer." (Plaintiff's Exhibit 33.)

Agostini apparently made no effort to follow up on the information Manganiello gave him. The record also indicates that Agostini made only the most superficial and credulous of inquiries of the taxi passenger who had been overheard telling someone he

- 21 -

had been present at the shooting and had seen the shooter. And the jury could infer that Agostini coerced a false statement about Manganiello from Booth in exchange for not reporting Booth to the organized crime bureau.

Further, it was permissible for the jury, on the evidence before it, to find that Agostini used Alston to inculpate Manganiello with no concern whatever for whether Alston's statements were truthful. It was clear that Agostini promoted Alston to the ADA as a witness against Manganiello despite knowing that Alston had already lied to him about Manganiello at least once; and it was clear that Agostini in his paperwork--some of which was sent to the ADA and would have been subject to discovery by Manganiello prior to the criminal trial--did not mention Agostini's belief that Alston was "playing games." In addition, given Alston's angry criticism of Agostini for interviewing Baker without Alston being present and Alston's insistence that any future alleged witness not be interviewed by Agostini in Alston's absence, the jury was entitled (a) to disbelieve Agostini's testimony that he had no suspicion that Alston was planning to continue fabricating evidence, and (b) to infer that Agostini did not inform the ADA of Alston's insistence because Agostini knew that if the ADA were aware of it she would question the veracity of statements thus procured.

In sum, looking at the evidence as a whole, the jury could permissibly infer that Agostini was determined simply to make a case against Manganiello, and that in order to do so Agostini

refrained from making inquiry into other possible suspects, ignored evidence that was inconsistent with his belief that Manganiello was guilty, declined to inform the ADA of, or to document, any exculpatory evidence or inconsistencies in the statements of witnesses who agreed to inculpate Manganiello, secured one statement inculpating Manganiello by agreeing not to disclose the witness's known criminal activities to the proper authorities, and included in some of Agostini's own reports supposedly factual statements adverse to Manganiello that were contradicted by persons having first-hand knowledge of the facts. The evidence amply supported the jury's finding that Agostini had engaged in misconduct and supported the conclusions both that the presumption of probable cause created by the grand jury indictment was rebutted and that probable cause was lacking.

B. <u>Other Elements of Malicious Prosecution</u>

Agostini also contends that he was entitled to judgment as a matter of law on the basis that Manganiello failed to establish that Agostini had caused the initiation or the continuation of the criminal proceeding and failed to establish that Agostini had acted with actual malice. Again, we disagree.

To initiate a prosecution, a defendant must do more than report the crime or give testimony. He must "play[] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." <u>Rohman v. New York City Transit Authority</u>, 215 F.3d at 217 (internal quotation marks

omitted). A jury may permissibly find that a defendant initiated a prosecution where he "fil[ed] the charges" or "prepar[ed an] alleged false confession and forward[ed] it to prosecutors." Ricciuti, 124 F.3d at 130. Here, there was sufficient evidence from which the jury could infer that Agostini, inter alia, actively elicited inculpatory statements from witnesses such as Alston and Booth, whose veracity in making such statements was circumstantially suspect; that Agostini forwarded those statements to the ADA; that Agostini was in touch with the ADA at least once a week; and that Agostini signed the felony complaint on which Manganiello was ultimately rearrested. This sufficed to satisfy the initiation-or-continuation element.

Finally, we also agree with the district court that the evidence was ample to permit an inference that Agostini proceeded against Manganiello with malice. First, "[a] lack of probable cause generally creates an inference of malice." Boyd v. City of New York, 336 F.3d at 78; see, e.g., Ricciuti, 124 F.3d at 131; Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996). Further,

> malice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff.

Pinsky v. Duncan, 79 F.3d 306, 313 (2d Cir. 1996) (internal quotation marks omitted); see also Lowth v. Town of Cheektowaga, 82 F.3d at 573 (malice may be proven by showing that the prosecutor had "a wrong or improper motive, something other than a

- 24 -

desire to see the ends of justice served" (internal quotation marks omitted)).

Malice on the part of Agostini could easily be inferred in light of the evidence in the present case of, inter alia, Agostini's apparently myopic focus on Manganiello, to the exclusion of all other suspects; Agostini's otherwise seemingly inexplicable false statements about Manganiello's conduct that were contrary to the reported first-hand knowledge of others; Agostini's willingness to coerce an inculpatory statement from one unwilling person in exchange for not reporting that person's known criminal activities; and his willingness to have Manganiello indicted on the basis of testimony of another person who was known to have lied to Agostini at least once in this very matter and who was evidently willing to intimidate others into falsely providing the evidence Agostini sought. The jury was entitled to find that Agostini's adherence to the view that Alston, in producing Damon, had given Agostini the "right" information (Tr. 248), while Agostini admitted that Alston had "asked Damon to lie about Anthony Manganiello" (id. at 330), was reflective of, in the words of Lowth, "something other than a desire to see the ends of justice served."

It was also understandably difficult for the jury to fathom an appropriate explanation for Agostini's misrepresentation, in the course of the criminal proceeding, of the contents of the note he had found in Manganiello's locker. To testify that Manganiello's note stating "I pray every day I will

- 25 -

never have to kill someone" instead said "I feel like killing somebody" (Tr. 266-67) cannot be viewed as better than a reckless disregard of Manganiello's rights. Although that statement was made after the initiation of the criminal proceeding, the jury was entitled, especially in light of the other evidence as to Agostini's conduct of the investigation, to view that misrepresentation as indicative of Agostini's state of mind all along.

C.  Qualified Immunity

> A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law, see, e.g., County of Sacramento v. Lewis, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.E.2d 1043 (1998); Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.E.2d 277 (1991); or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred, see, e.g., Harlow v. Fitzgerald, 457 U.S. 800, 817-19, 102 S.Ct. 2727, 73 L.E.2d 396 (1982); or (3) if the defendant's action was "objective[ly] legal[ly] reasonable[] . . . in light of the legal rules that were clearly established at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639 (1987), 107 S.Ct. 3034, 97 L.E.2d 523 (internal quotation marks omitted) . . . .

Munafo v. Metropolitan Transportation Authority, 285 F.3d 201, 210 (2d Cir. 2002). Only the third aspect of the qualified immunity doctrine was genuinely at issue in the present case, for "[f]reedom from malicious prosecution is a constitutional right that has long been clearly established." Kinzer v. Jackson, 316 F.3d 139, 143 (2d Cir. 2003).

"Whether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact." Zellner, 494 F.3d at 367. The factfinder must determine any disputed material facts, and on the basis of the facts permissibly found, the court must decide "whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, i.e., whether officers of reasonable competence could disagree as to the lawfulness of such conduct." Id.

Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent. See, e.g., Hunter v. Bryant, 502 U.S. 224, 229 (1991) ("The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" (quoting Malley v. Briggs, 475 U.S. 335, 343, 341 (1986))). With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective reasonableness. Thus, the doctrine shields officers from suit for damages if "'a reasonable officer could have believed'" his action "'to be lawful, in light of clearly established law and the information [he] possessed.'" Hunter, 502 U.S. at 227 (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987)). That is, "[e]ven if the right at issue was clearly established in certain respects . . . an officer is still entitled to qualified immunity if 'officers of reasonable

competence could disagree' on the legality of the action at issue in its particular factual context." Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007) (quoting Malley, 475 U.S. at 341).

In the present case, given the jury's findings that Agostini misrepresented the evidence to the prosecutors, or failed to pass on material information, or made statements that were false, and engaged in such misconduct knowingly, and given the ample evidentiary support for those findings, the district court correctly concluded that no reasonable officer could have believed Agostini's actions to be lawful. Agostini's motion for judgment as a matter of law based on qualified immunity was properly denied.

## III. DENIAL OF THE MOTION FOR A NEW TRIAL

Agostini contends that the district court should at least have granted him a new trial, arguing principally that the court (a) erroneously instructed the jury that it was permitted to draw an inference adverse to Agostini as to the contents of the missing criminal case file, (b) inappropriately curtailed defense counsel's summation, (c) failed to find the jury's verdict excessive, and (d) improperly interrupted the questioning of the witnesses and made inappropriate comments during the trial.

The district court's denial of a Rule 59 motion for a new trial is reviewed for abuse of discretion. See, e.g., AMW Materials Testing, Inc. v. Town of Babylon, 584 F.3d 436, 456 (2d

Cir. 2009). A district court has abused its discretion if it has (1) "based its ruling on an erroneous view of the law," (2) made "a clearly erroneous assessment of the evidence," or (3) "rendered a decision that cannot be located within the range of permissible decisions." Sims v. Blot, 534 F.3d 117, 132 (2d Cir. 2008) (internal quotation marks omitted). For the reasons that follow, we find no basis for reversal here.

A.  The Adverse Inference Instruction

As discussed in Part I.A. above, the case file in Manganiello's criminal proceeding disappeared prior to his trial and was never found. The court in the present case gave the jury an instruction that stated, in part,

> [i]f you find that a party could have produced documents or other evidence in this lawsuit, and that such evidence was at one time within that party's control or in his or her custody, and that this evidence would have been relevant in deciding facts in dispute in this lawsuit, you are permitted, but not required, to infer that the evidence, if produced, would have been unfavorable to that party.

(Tr. 782-83 (emphasis added).) Agostini contends that this instruction should not have been given, arguing principally that Manganiello did not establish that Agostini had custody or control over the homicide file when it was lost or misplaced, or that Agostini had an obligation to preserve the file at that time, or that the files were destroyed with a culpable state of mind, or that the missing documents were relevant. We disagree.

The suggestion that none of the missing documents would have been relevant here is belied by the various discrepancies,

- 29 -

discussed in Parts I.A. and II.A. above, among versions of the conduct attributed to Manganiello. For example, the record contains DD5s indicating divergent statements by Cobb, the only witness whose testimony--consistent with most of the DD5 on Martinez's interview of Cobb--placed Manganiello in the basement at the time of the shooting. Yet from Martinez's DD5 on his interview with Perez, it is inferable that Cobb did not tell Perez, the first officer to question him at the scene of the crime, that the basement door had burst open seconds after the shot and that he saw Manganiello emerge from the basement, for it seems inconceivable that Perez would not have included that information when he was interviewed by Martinez. And it seems unlikely that Cobb would have failed to describe such a startling sequence of events to Perez immediately after the incident if the incident was as Cobb eventually described it to the grand jury. The handwritten notes made prior to the preparation of the various DD5s may have contained clarifying information that was not incorporated in the DD5s, including information as to the provenance of the variations in the versions given by Cobb.

The contention that Agostini had no obligation to preserve the case file is frivolous. The case file had been committed to his custody as the leader of the investigative team, and Agostini admitted at trial that it was his responsibility to preserve the evidence until the time of trial (see Tr. 235-36; see also id. at 612 (similar testimony of the ADA)). Agostini's contention that the case file--which he left under his desk or on top of a

locker--was not under his control amounts to no more than an inappropriate attempt to abdicate his responsibility for its preservation. Although Agostini testified at trial that he had removed the case file from a room in which such files were normally kept because that room was being "clean[ed] . . . out" (id. at 242), he gave no reason for not putting the case file in some other safe place--other than his explanation that the papers were in a box, and the box itself was too large to fit into a secure file cabinet (see id. at 241-42; (id. at 242 ("It was just too big of a box."))).

In addition to instructing the jury that it could, but was not required to, draw an inference that missing files would have contained information adverse to the party who had and lost them, the court told the jury that

> [i]n deciding whether to draw this inference, you should consider whether the evidence that was not produced would merely have duplicated other evidence already introduced. You may also consider whether the party has offered a reason for not producing this evidence, and whether that reason was explained to your satisfaction.

(Tr. 783.) We see no error or abuse of discretion in the giving of these instructions.


B.  The Exhibits and the Defense Summation

Agostini complains that the district court improperly allowed Manganiello to interrupt the defense summation and prevented defense counsel from making points to the jury with regard to certain DD5s, marked for identification as defendants'

exhibits "P-2" and "Z-7." The record reflects an unusual amount of confusion among the parties and the court but reveals no error by the court and no prejudice to Agostini.

During the trial, the court had admitted in evidence a number of documents offered by the defendants. Thereafter, in a colloquy not characterized by clarity, defense counsel stated, "your Honor, defendants would just enter into evidence the remaining DD5s which have yet to be entered into evidence, which I can read if your Honor requires" (Tr. 326); the court responded, "We will just get a list later" (id. (emphasis added)); and Manganiello's attorney said, "For the record, Judge, we stated the objections that were previously stated" (id.). Defense counsel did not, however, supply the court with a list as requested by the court (see id. at 765-66), and "P-2" and "Z-7" were not among the documents shown in the trial transcript to have been admitted in evidence before the commencement of summations.

During his summation, defense counsel asked the jury to consider "P-2" and "Z-7," and Manganiello objected on the ground that they had not been admitted in evidence. As asking the jury to consider documents that are not in evidence is improper, the court instructed defense counsel not to refer to "P-2" and "Z-7" and stated that those documents would not be given to the jury unless and until there was a determination that they were admitted in evidence. (See id. at 705-07.)

Following the completion of summations, the court determined, in conference with the parties, that in fact it had

- 32 -

not admitted "P-2" and "Z-7" during the testimony of any witness, as no witness had mentioned them and they had not been shown to any witness; and it had not admitted them as part of defense counsel's proposed admission of DD5s in bulk because defendants had not submitted to the court the required list of such documents. Nonetheless, given the confusion, the court decided at the post-summation conference to admit "P-2" and "Z-7" in evidence. Accordingly, when the jury asked to see those documents during its deliberations, they were given to the jury.

Agostini complains that the court did not also allow defense counsel to reopen his summation to review those documents with the jury. Such a matter is committed to the discretion of the trial court, and we see no abuse of discretion here. "P-2" and "Z-7" apparently had not been admitted in evidence at the time of the summations, and the defense bears some or all of the responsibility for the confusion as to whether they were in evidence and for the fact that they were not. It was well within the court's discretion to decline to allow the defense summation to be reopened.

C. The Challenge to the Amount of the Jury's Verdict

Agostini contends that the jury's award of $1,426,261 in compensatory damages was excessive and that the district court should have ordered a remittitur or a new trial. We are unpersuaded, as a jury's damages award may not be set aside unless "'the award is so high as to shock the judicial conscience and

constitute a denial of justice,'" O'Neill v. Krzeminski, 839 F.2d 9, 13 (2d Cir. 1988) (quoting Zarcone v. Perry, 572 F.2d 52, 56 (2d Cir. 1978)).

The record in the present case included evidence that Manganiello, age 38 at the time of his arrest--and age 42 by the time he was acquitted--had, among other things, been discharged from his job at the Parkchester, been discharged from his part-time job as a state park policeman, and been stripped by the City of his special patrol officer certifications; and he was past the age at which he could reenter the police academy to re-earn such certifications. Further, in the wake of his arrest, Manganiello, who had had no prior history of psychiatric problems, became agoraphobic and subject to frequent panic attacks, dizziness, and nausea. Dr. Rehana Latif, the psychiatrist who treated Manganiello during the seven years between his arrest and the trial in the present case, diagnosed Manganiello with post-traumatic stress disorder and major depression, and she testified that the severe stress caused him to have a chemical imbalance. Dr. Latif testified that the chemical imbalance

> ha[d] permanently disabled him and his prognosis is poor to fair. (Tr. 679, 680-85.) She further testified that Manganiello is unable to pursue any work because his cognitive functioning, emotions, concentration, understanding and energy levels are too impaired. (Tr. 679, 680, 684.)

Manganiello II, 2008 WL 5159776, at *18; see also id. ("Dr. Latif testified that Manganiello suffered from moderate to severe panic attacks, which caused him to be unable to function in any capacity or to work. (Tr. 675-77.)"). Manganiello's "expert economist[]

- 34 -

calculated Manganiello's pecuniary losses conservatively." Manganiello II, 2008 WL 5159776, at *19. The economist (a) calculated that Manganiello's lost past earnings amounted to $377,000; and (b) assuming that Manganiello would have retired at age 61.5, and discounting future lost earnings to present value, calculated Manganiello's lost future earnings to be $829,000. Id. The court noted that defendants had not presented any evidence to rebut the testimony of either the psychiatrist or the economist. The court noted that "Manganiello was also entitled to recover the $110,000 in attorneys' fees that he paid for his criminal defense, which he would not have had to pay but for the malicious prosecution." Id.

Thus, the court found that the record supported an award of more than $1,310,000 in pecuniary losses, and that that sum, as well as the remainder of the jury's award, approximately $116,600, for the wrongful incarceration and humiliation, was

> in line with the awards in the cases cited by Agostini. See, e.g., Gentile v. County of Suffolk, 926 F.2d 142, 153 (2d Cir.1991) (affirming award of $150,000 for pain and suffering, several days of false imprisonment, psychological trauma, loss of job opportunities and attorneys' fees). See also Papa v. City of New York, 194 A.D.2d 527, 532, 598 N.Y.S.2d 558 (N.Y.App.Div.1993) (lost earnings calculated to be over $3 million in malicious prosecution case).

Manganiello II, 2008 WL 5159776, at *19.

Given the evidence, we see no error in the district court's conclusion that the jury's verdict was not so large as to shock the judicial conscience.

- 35 -

D.  Allegedly Prejudicial Comments by the Court

Finally, Agostini contends that during the trial, the court made prejudicial comments or asked questions that may have had the effect of bolstering the testimony of witnesses for Manganiello and suggesting to the jury that the court favored the plaintiff's case.  A "court must strive for 'that atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding' . . . . and must be especially cautious and circumspect in language and conduct during a jury trial."  Santa Maria v. Metro-North Commuter R., 81 F.3d 265, 273 (2d Cir. 1996) (quoting Glasser v. United States, 315 U.S. 60, 82 (1942)).  "[A]sking numerous and probing questions of witnesses is unquestionably proper," although the "trial judge should limit questioning to inquiries necessary to clarify ambiguities, correct misstatements, or obtain information necessary to make rulings."  Shah v. Pan American World Services, Inc., 148 F.3d 84, 98 (2d Cir. 1998) (internal quotation marks omitted), cert. denied, 525 U.S. 1142 (1999).  Reversal may be appropriate if the judge has expressed his "opinion on an ultimate issue of fact in front of the jury or [has argued] for one of the parties," id. (internal quotation marks omitted).  Nonetheless, "[i]n reviewing a challenge to a trial judge's conduct, we determine not whether the trial judge's conduct left something to be desired," but rather, in light of the record as a whole, "whether the judge's behavior was so prejudicial that it denied [a party] a fair, as opposed to a perfect, trial."  Id. (internal quotation marks

omitted); see, e.g., United States v. Rosa, 11 F.3d 315, 343 (2d Cir. 1993), cert. denied, 511 U.S. 1042 (1994); United States v. Manko, 979 F.2d 900, 905-06 (2d Cir. 1992), cert. denied, 509 U.S. 903 (1993).

We see no basis for reversal here. Although the court asked questions and made comments, our review of the record persuades us that the court was attempting to gain clarification for the jury and to prevent the trial from becoming bogged down in repetitious or inappropriate advocacy. And the court so informed the jury. In denying Agostini's motion for a new trial on this ground, the district court, after discussing the above principles governing the conduct of a trial judge, noted in part that

> [a]ll the questions that this Court posed to witnesses were for clarification and due to the fact that, in the case of Agostini, his testimony was frequently contradictory and ambiguous and appeared less than candid and forthcoming. In any event, the jury was thoroughly instructed that they were not to draw any inferences from the Court's questions:

> I also ask you to draw no inference from the fact that upon occasion I may have asked questions of certain witnesses. Such questions were only intended for clarifications or to expedite matters and certainly were not intended to suggest any opinion on my part as to the verdict you should render or whether any of the witnesses may have been more credible than any other of the witnesses.

Manganiello II, 2008 WL 5159776, at *14 (quoting Tr. 772). The court also instructed the jury to draw no inferences from the court's rulings:

> During the trial, I have been called upon to make rulings on various questions. Those rulings are not evidence and need not be considered by you. Procedural matters are matters of law and, although

- 37 -

you may have been curious about them, you should not consider them.

The rulings I have made during the trial are not any indication of my views of what your decision should be.

(Tr. 772.)

We have no doubt that the court's cautionary instructions were heeded. The jury returned a finely tuned verdict in which it found that three of the five defendants it was considering had not engaged in malicious prosecution of Manganiello, and that of the two defendants who had, only Agostini had done so knowing that he was engaging in misconduct. We have examined the record and are persuaded that the trial court's comments, questions, and rulings did not deny Agostini a fair trial.


## CONCLUSION


We have considered all of Agostini's contentions on this appeal and have found them to be without merit. The judgment of the district court is affirmed.