DENNIS JACOBS, Chief Judge,
with whom Judge CABRANES, Judge RAGGI, Judge WESLEY, and Judge LIVINGSTON join,
dissenting from the denial of rehearing in banc:
I concur entirely in Judge Raggi’s dissenting opinion. I dissent separately to make some additional points.
I
Under Section 1983, personal liability may not be imposed on a government actor unless [1] his conduct violated “clearly established constitutional rights” and [2] it would have been unreasonable for him to have believed otherwise. Holcomb v. Lyk-ens, 337 F.3d 217, 220 (2d Cir.2003) (quoting Weyant v. Okst, 101 F.3d 845, 857 (2d Cir.1996)). Liability is precluded if government actors “of reasonable competence could disagree on the legality of the action at issue in its particular factual context.” Manganiello v. City of N.Y., 612 F.3d 149, 165 (2d Cir.2010) (internal quotation mark omitted). “When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law.” Ashcroft v. al-Kidd, — U.S. -, 131 S.Ct. 2074, 2085, 179 L.Ed.2d 1149 (2011) (internal quotation marks omitted).
It is easy to demonstrate that the panel opinion has jumped the rails. Not only could other reasonably competent child welfare workers conclude (as Mr. Woo did) that the Southerland household constituted an “emergency,” but Mr. Woo’s supervisor reached that very conclusion in this very instance. See Southerland v. City of N.Y., 680 F.3d 127, 134-35 (2d Cir.2012) (recounting that Mr. Woo applied for an order to enter the Southerland apartment “at the direction of [his] supervisor” and that, based on Mr. Woo’s observations inside the apartment, “[Mr.] Woo and his supervisor concluded that the children’s safety was threatened, and [Mr. Woo’s supervisor] directed [Mr.] Woo to remove the children from the home”); see also Messerschmidt v. Millender, — U.S. -, 132 S.Ct. 1235, 1250, 182 L.Ed.2d 47 (2012) (that an officer obtained the approval of a superior before applying for a warrant “is *135 certainly pertinent in assessing whether [he] could have held a reasonable belief that the warrant was supported by probable cause”). And the Family Court would not have taken the children from Souther-land unless a hearing confirmed Mr. Woo’s professional judgment that the conditions created by Southerland were unsafe for children. See In re Ciara M., 273 A.D.2d 312, 708 N.Y.S.2d 717, 719 (App.Div.2d Dep’t) (affirming the Family Court’s finding that Southerland sexually and physically abused his children), leave to appeal denied, 95 N.Y.2d 767, 717 N.Y.S.2d 547, 740 N.E.2d 653 (2000). These circumstances should have disposed of this case years ago on a basis that would require no opinion.
II
The State of New York deemed South-erland unfit to keep custody of his children by reason of his neglect, beatings and sexual abuse. Yet, in a way that seems unaccountable, the panel opinion allows him to seek damages for loss of consortium against the child welfare worker who temporarily removed the children from his home. And it allows the abused children to sue their rescuer for allegedly effecting the rescue prematurely. Our legal system cannot afford such a result. In my view, Mr. Woo conducted himself as a reasonable and conscientious child services worker.
Fourth Amendment. The panel concludes that Mr. Woo is not entitled even to qualified immunity on the plaintiffs’ Fourth Amendment unlawful search claims, on the ground that errors and omissions in his affidavit for an Order Authorizing Entry to Southerland’s apartment would, if corrected, have defeated probable cause. The panel finds fault with Mr. Woo’s affidavit because: [1] information is omitted suggesting that Ciara (a daughter who drank a can of paint and later complained of molestation by her father) might not be found at Southerland’s apartment because she was said to have run away; [2] Ciara’s swallowing of a can of paint was characterized as a suicide attempt; [3] no mention is made that Ciara swallowed the paint at school (rather than in Southerland’s apartment); and [4] the children listed were the six children living with Southerland’s former “common-law wife,” Diane Manning, not the six children living with Southerland. See Southerland, 680 F.3d at 144-46, 147-48.
I find it uncontroversial (to say the least) that a child welfare worker has probable cause to believe that a child may be found on the premises of the residence of her custodial parent. Moreover, South-erland himself would be the ultimate source for any report that Ciara had “run away.” Even if Mr. Woo believed South-erland’s report that Ciara had run away, he still would have had cause to believe that she might be found in Southerland’s apartment — she could have returned home, or been returned, or her father may have lied, and she might have been there all along enduring his sexual abuse. Mr. Woo cannot be faulted for starting his investigation of child abuse at the child’s legal residence. And one must hope that child abusers do not learn that probable cause for a warrant can be defeated by a parent’s assurance that his abused child is no longer residing at home.
As to the affidavit’s characterization of Ciara’s paint swallowing, it seems obvious that this was a suicide attempt, or at least an ideation of suicide that required prompt intervention. That is how it was understood by the guidance counselor who reported the incident. See id. at 133-34. It makes no difference whether the incident took place at school or at Southerland’s apartment; either way, Southerland’s fail *136 ure to seek medical attention for his daughter bespeaks neglect.
The panel criticizes Mr. Woo for listing the wrong children’s names on the application, as if this were an obvious and decisive blunder. Given that there are at least thirteen children and five adults in this decidedly improvised family structure, such an error cannot render the affidavit fatally defective. Regardless of the children’s names, Mr. Woo’s application accurately conveyed the basis for his reasonable belief that probable cause existed to think that children in Southerland’s apartment were being neglected — as in fact they were. Because there is no “genuine dispute that a magistrate would have issued the warrant on the basis of the corrected affidavit ],” Mr. Woo was entitled to judgment as a matter of law. Walczyk v. Rio, 496 F.3d 139, 158 (2d Cir.2007) (internal quotation mark omitted).
Even if the supposed errors in Mr. Woo’s affidavit were essential to the finding of probable cause — and they plainly were not — there is no basis for thinking that any of the errors were made out of malice or recklessness, as opposed to justified haste. Mr. Woo is entitled to qualified immunity on that basis alone. See Golino v. City of New Haven, 950 F.2d 864, 870-71 (2d Cir.1991) (to sustain a Section 1983 claim based on errors in a warrant affidavit, a plaintiff must show “that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was necessary to the finding of probable cause” (internal quotation mark omitted)). Plaintiffs never alleged malice, and there is no such record evidence.[1] Absent some such evidence, there can be no genuine issue of material fact necessitating a trial on plaintiffs’ claims of unlawful search.
Due Process and Seizure. As to the claims of procedural due process and Fourth Amendment unlawful seizure, the panel holds that, at the time the children were removed, it was clearly established law that officials could not remove a child from the custody of a parent (without consent or a prior court order) absent emergency circumstances. Southerland, 680 F.3d at 149-50; see also Hurlman v. Rice, 927 F.2d 74, 80 (2d Cir.1991).
But Mr. Woo as well as his supervisor (who ordered the removal) concluded that an emergency existed. Based on Mr. Woo’s observations and what he knew, he reasonably perceived a pattern of neglect and abuse. The panel assumes (though I do not) that a reasonable jury would conclude that Mr. Woo — who was found in Family Court to have truthfully reported Southerland’s sexual and corporal abuse— is lying about perceived evidence of neglect, whereas Southerland' — who was found to have lied in Family Court when he denied the abuse — is telling the truth about maintaining a home for the children that was tidy, safe, and stocked with nourishing food. But in any event, a pattern of neglect was manifested by facts that cannot be disputed: Southerland’s reported failure to seek medical attention for Ciara after her suicide attempt, or for Venus, whom caseworkers found limping from a foot injury she incurred after stepping on an exposed nail. As the opinion concedes, this Circuit has never “set forth exhaustively the types of factual circumstances *137 that constitute imminent danger justifying emergency removal.” Southerland, 680 F.3d at 149. That seems to me to be a wise forbearance. But here, where no medical treatment was sought notwithstanding that the Southerland children were at risk for suicide and lockjaw, it was not objectively unreasonable for Mr. Woo to believe that the children were “bereft of adequate care or supervision” and that their removal was therefore justified. Ro-bison v. Via, 821 F.2d 913, 922 (2d Cir. 1987). The panel’s contrary decision undermines our precedent, which has “emphasize[d] ... the importance of the availability of qualified immunity where child welfare workers are seeking to protect children from abuse.” Tenenbaum v. Williams, 193 F.3d 581, 605 (2d Cir.1999); see also id. (“If caseworkers of reasonable competence could disagree on the legality of a defendant’s actions their behavior is protected.” (internal quotation marks and brackets omitted)).
Ill
Nothing can account for such an opinion and result except the panel’s tacit assumption that Mr. Woo is merely a nominal defendant, that the City of New York will take on his defense and indemnify him for any judgment, and that litigation like this is not really a claim against the individual but is in effect an instrument for developing ever more ramified constitutional principles and for policing governmental compliance with these constitutional developments. This is an almost-eomplete misconception of Section 1983 claims against individuals.
An individual defendant has at stake his savings, his pension, the equity in his home, the kids’ college fund: This should tell us something about the threshold of liability. Properly applied, Section 1983 punishes intentional and egregious violations of constitutional rights while respecting the discretion of government actors, and tolerating their good faith errors and misjudgments. See Defore v. Premore, 86 F.3d 48, 50 (2d Cir.1996) (per curiam) (discussing the “importance of the defense of qualified immunity to insure that publicly employed caseworkers have adequate latitude to exercise their professional judgment in matters of child welfare”).
The drift of the law that has carried this case along has been to ignore the standard appropriate to liability of individuals, and to assume that a Section 1983 action is in effect a suit not against the individual defendant but against the government subdivision that employs him. This buried assumption inheres in other cases; but this case raises it to the surface. There are several things wrong with that approach.
• Municipalities are not liable under Section 1983 for the actions of their employees based on respondeat superior; municipalities are liable only if the violation of individual rights results from the “government’s policy or custom.” Monell v. Dep’t of Soc. Servs., 436 U.S. 658, 691-94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The idea that the municipality or other state subdivision is the real defendant in a case against the individual is thus an end-run around Monell.
• We have come to treat municipal indemnification like insurance, and in that way discount the harshness of a potential damages award against the individual government worker. Of course, juries are not permitted to consider the availability of insurance in assessing fault. See, e.g., Fed.R.Evid. 411; Salm v. Moses, 13 N.Y.3d 816, 817, 890 N.Y.S.2d 385, 918 N.E.2d 897 (2009). One reason is the risk that jurors would disregard controlling principles in order to compensate plaintiffs without valid claims and over-compensate those whose claims are valid. See Lough- *138 lin v. Brassil, 187 N.Y. 128, 79 N.E. 854, 857 (1907) (observing that “in the case of an individual defendant it might make it much easier to find an adverse verdict if the jury understood that an insurance company would be compelled to pay the verdict”). Universally, juries are insulated from the temptation to distort the law in that way; it would be healthy if we recognized the comparable risk that municipal indemnification poses to judicial consideration of Section 1983 claims.
• The premise — that a suit against an individual government employee is in substance a suit against his employer — is also wrong. In the City of New York (and doubtless in some other political subdivisions of this Circuit), the government supplies defense counsel and pays the judgment — except in the egregious cases to which alone Section 1983 should apply. But this Circuit includes scores of counties and hundreds of towns and municipalities; and there are thousands of political subdivisions in the nation. Not all of them will indemnify their employees for Section 1983 judgments; many cannot even afford to furnish a defense; some can barely keep the school open. Counterparts to Mr. Woo, who are employed elsewhere, face ruin and bankruptcy in Section 1983 cases.
• There is a big gap between the egregious conduct that supports Section 1983 liability and merely imperfect or negligent conduct. Some would fill that gap by an assumption, contrary to fact, that government workers are all constitutional law professors, or at least lawyers — or that they would be improved if they were. Such persons fail to understand that child welfare workers, teachers, prison guards, probation officers, and police learn and practice the skills of their own demanding professions, and do not in the usual course absorb lengthy opinions of this Court, not all of which are illuminating.
• The panel’s opinion and the assumptions that animate it have effects that reach beyond Mr. Woo and the City of New York as his employer: There is a substantial and direct impact on public safety. The imposition of personal liability, particularly in jurisdictions where the judgment is not indemnified or insured, creates an incentive for child welfare workers (and other government employees charged with protecting the public) not to act. When the panel opinion in this case is considered together with DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), holding that state officials have no constitutional duty to protect children against domestic abuse, a perverse incentive is created. A child welfare worker is shielded from liability when she recklessly fails to protect abused children, but she is exposed to personal liability when she acts in good faith to protect them. Faced with these choices, a rational child welfare worker will err on the side of caution every time — and children who otherwise would have been rescued from dangerous and abusive situations will live in peril.
IV
We should appreciate that conscientious child welfare workers must promptly make anguished decisions. As judges, we can weigh the legal issues presented and draft at leisure, assisted by a journal of law clerks. Mr. Woo had none of these advantages; and he acted as (one hopes) any dutiful child welfare worker in his position would have done. Not only was Mr. Woo not so “plainly incompetent” as to forfeit the protections of qualified immunity, al-Kidd, 131 S.Ct. at 2085 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)), his judgment that Southerland was abusing or neglecting his *139 children was spot on, and was vindicated by the Family Court’s findings of sexual and physical abuse.
The panel would send Mr. Woo to a jury for an assessment of his liability and the damages he should pay. I would shake his hand.

. The panel opinion suggests that Mr. Woo's answer to a deposition question concerning his reason for entering the Southerland apartment implies that he knew Ciara Manning would not be found there. Not so: Mr. Woo explained that he sought to enter the apartment to look for "[t]he Manning children,” which obviously includes Ciara. Southerland, 680 F.3d at 147-48 (brackets in original).