**10-4731(L)-cv / 10-4894-cv**
**Jones v. East Haven**

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2011

(Argued: January 18, 2012          Decided: August 1, 2012)

Docket Nos. 10-4731-cv (L), 10-4894-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

EMMA JONES, as Administratrix of the Estate of Malik Jones and as Guardian Ad Litem for
Priya Jones,
          *Plaintiff-Appellee-Cross-Appellant*,

v.

TOWN OF EAST HAVEN,
          *Defendant-Appellant-Cross-Appellee*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before:   WALKER, LEVAL, POOLER, *Circuit Judges*.

Defendant, the Town of East Haven, appeals from a judgment of the United States District Court for the District of Connecticut (Thompson, *J.*) based on a jury's verdict awarding damages to Plaintiff under 42 U.S.C. § 1983 for the killing of her son by an East Haven police officer. The district court denied the Defendant's motion for judgment as a matter of law. On appeal, Defendant argues that, as a matter of law, Plaintiff's evidence was insufficient to prove municipal liability under the standard of *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The Court of Appeals (Leval, *J.*) agrees with Defendant. Accordingly, the judgment of the district court is **REVERSED**.

> NANCY FITZPATRICK MYERS, (Steven J.
> Errante, *on the brief*), Lynch, Traub, Keefe &
> Errante, P.C., New Haven, CT, *for Defendant-*
> *Appellant-Cross-Appellee*.

DAVID N. ROSEN, David Rosen & Associates, P.C., New Haven, CT, *for Plaintiff-Appellee-Cross-Appellant*.

Leval, *Circuit Judge*:

Defendant, the Town of East Haven (hereinafter "Town"), appeals from the judgment after a jury trial of the United States District Court for the District of Connecticut (Thompson, *J.*), awarding damages to Plaintiff under 42 U.S.C. § 1983 for the killing of her son by an East Haven police officer. The Town contends it was entitled to judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure because Plaintiff's evidence failed to satisfy the standard of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for municipal liability. In 1997, Malik Jones, an African-American male, was shot and killed by Officer Robert Flodquist, a member of the East Haven Police Department (hereinafter "EHPD" or "Department"). Plaintiff Emma Jones, who is the mother of Malik Jones, filed suit against the Town, Officer Flodquist, and Officer Gary DePalma, pursuant to Section 1983, alleging numerous claims, including that the Town's custom, policy, or usage of deliberate indifference to the rights of black people caused the killing of her son in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. At trial, the jury found in favor of the two police officers, but found the Town liable. The district court denied the Town's motion for judgment as a matter of law and entered judgment against it. On appeal, the Town contends that Plaintiff's evidence was legally insufficient to demonstrate a custom, policy, or usage of deliberate indifference which caused Jones's death. We agree that the evidence was insufficient.[1]

---

[1]We are aware of recent reports concerning the alleged misconduct of EHPD officers. *See, e.g.*, Peter Applebome, *Police Gang Tyrannized Latinos, Indictment Says*, N.Y. TIMES, Jan. 25, 2012. It has been reported that in December 2011 a Justice Department investigation

Accordingly, we reverse the judgment in Plaintiff's favor and direct the entry of judgment for the Defendant Town.

## BACKGROUND

Plaintiff's evidence at trial was as follows:

**A.      Shooting of Malik Jones**

On April 14, 1997, shortly after 6 p.m. in East Haven, Connecticut, Malik Jones was driving an Oldsmobile Cutlass with Samuel Cruz, also an African-American male, in the passenger seat. Jones was followed by Officer Flodquist, in a police department vehicle, who reported to his dispatcher that he was trying to catch up with the Oldsmobile. Jones then made a U-turn and began heading in the direction of neighboring New Haven. Flodquist informed the dispatcher that the driver of the Oldsmobile was "taking off" on him. Officer DePalma of the EHPD joined the pursuit in another vehicle. The officers followed the Oldsmobile on to, and off of, Interstate 95, and into New Haven.

After entering New Haven, Jones lost control of the Oldsmobile and veered into a vacant

---

concluded that the EHPD had "engaged in widespread biased policing, unconstitutional searches and seizures, and the use of excessive force." *Id.* (internal quotation marks omitted). Additionally, in January 2012 the FBI arrested four EHPD officers on charges of conspiracy, false arrest, excessive force, and obstruction of justice for their mistreatment of Hispanic residents of the Town. *Id.* Our ruling on this appeal should not be taken as expressing any view of this court on the question whether the Town of East Haven or its police department discriminated in any way against minorities. A federal appellate court makes no assessment of the true facts. Our court has no investigative authority  and does not find facts. It reviews only the record created by the parties in the course of trial. We conclude, for reasons expressed below, that the Plaintiff's evidence presented at trial was insufficient as a matter of law to establish liability of the Town by reason of a custom, policy, or usage of discrimination or of indifference to discrimination. Whether that is because there is no real discrimination or indifference, or because Plaintiff has simply failed to discover and present evidence of it, is beyond the competence of this court. Our ruling assesses only the sufficiency of the evidence presented at the trial – not the true facts.

lot off Grand Avenue, made a semi-circle, and then exited the lot back onto Grand Avenue. The Oldsmobile came to a stop in the westbound lane of Grand Avenue when its path was blocked by Flodquist's and DePalma's police vehicles. Flodquist approached the driver's side of the vehicle with his weapon drawn and used the butt of his gun to break the driver's window.

The witnesses' testimony differed on exactly what happened between the time the Oldsmobile stopped on Grand Avenue and the shooting. They agreed on several facts but disagreed as to the sequence. The witnesses agreed that after Jones came to a stop, when his way was barred by the police vehicles, Jones shifted into reverse. The Oldsmobile moved backwards, in a circular path. At some point Flodquist was in danger of being hit by the front end of the retreating Oldsmobile, as it swerved out to the side. Forensic evidence demonstrated that Flodquist fired four shots after the Oldsmobile had started moving in reverse. Jones was pronounced dead at the scene. It was undisputed that neither Jones nor Cruz was armed. It is also undisputed that Flodquist's gun could hold twelve bullets, and after the shooting only seven bullets remained in the weapon. The witnesses did not agree on whether Flodquist fired four or five shots or exactly when he fired the first shot.

Flodquist testified that he was in the path of the moving car and would have been struck by it if he had not moved. He testified that he believed the driver of the car was trying to run him over, which is why he began shooting. He testified that he fired only four shots, all of which were fired after the Oldsmobile started moving on its backwards circular path.[2]

Plaintiff contended that Flodquist fired five shots, and that he fired the first shot

---

[2] Flodquist testified that the fifth bullet missing from his magazine had been fired when he had been dispatched to shoot at a sick animal three weeks earlier on March 24.

immediately after breaking the driver's side window of the Oldsmobile, before the Oldsmobile began moving in reverse, and before any issue arose of Flodquist's ability to get out of the retreating car's path. The passenger Cruz testified, with support from other witnesses, that the car began moving in reverse only after Jones had been shot.

A witness testified that after the shooting, DePalma and another EHPD Officer, Ranfone, left Jones face down on the ground with his feet inside the car and his hands cuffed behind his back. Another witness testified that Ranfone aproached a dark-skinned Hispanic man who had witnessed the shooting and told him "You didn't see nothing. Now get out of here."

**B.     Evidence Relating to Liability of the Town**

To establish liability of the Town, Plaintiff contended that the Town had a custom, policy, or usage of deliberate indifference to the rights of black people. The evidence on that question was as follows.

**1.     East Haven**

James Criscuolo, who was the Department's Chief of Police from May 1993 until he retired in July 1998, testified about the policies and practices of the EHPD. Criscuolo testified that in 2000 East Haven's population was approximately 1.4% African-American and that during his time as Chief, the Department was all-white. Criscuolo testified that the Department was covered by the Town's policy prohibiting discrimination on the basis of race or color. He also testified that during his tenure as Chief, there had never been a formal complaint alleging that the Department's officers engaged in racial profiling.

**2. Shane Gray**

Evidence was received relating to Officer Flodquist's apprehension of Shane Gray, an African-American male, on September 15, 1991. That evening an East Haven resident was robbed at gunpoint on Eastern Circle in New Haven. The New Haven Police Department sent out a bulletin to surrounding departments that three unknown black males in their twenties were wanted for robbery with a firearm. The bulletin also stated the perpetrators had fled the scene in a light blue Oldsmobile Sierra and provided the vehicle's license plate number.

Gray testified that he exited his residence in New Haven that evening and saw two of his neighbors taking joyrides in a car on Eastern Circle. They allowed Gray to take the car for a ride. As Gray approached an intersection in the car (which matched the description given in the police bulletin), he saw two EHPD cruisers in front of him blocking the road. Gray panicked and jumped out of the car while it was still moving and ran into a nearby field. Flodquist pursued Gray across the field in his police cruiser. Gray testified that, as he ran across the field, Flodquist's cruiser caught up to him and hit him. Once he was hit, Gray rolled up onto the hood of the cruiser. The cruiser then slid into a ditch. Gray rolled off the hood of the cruiser, jumped up, and ran out of the ditch. Gray looked back and saw that Flodquist had remained in the vehicle. Gray testified that Flodquist then shot at him, without saying "freeze" or providing any other kind of warning. Gray ran to a nearby building, knocked on the door, and laid down on the porch. Officers arrived at the porch, placed Gray in handcuffs, and placed him in an EHPD cruiser. Gray was charged with larceny, carrying a pistol without a permit, interfering with police, and reckless endangerment and was released on bond.

An internal investigation was conducted into whether Flodquist's discharge of his weapon was justified. The investigation was conducted by then-Captain Criscuolo. Flodquist testified that, after the investigation, it was determined that his actions were justified. Gray testified that he was never contacted by the EHPD about the incident. A report of the investigation was destroyed by the EHPD's keeper of records in accordance with state regulations.

### 3. Donald Jackman

Donald R. Jackman, a Caucasian male, testified about the events surrounding his arrest by EHPD officers in the early morning hours of January 8, 1996. That morning four members of the EHPD–Sergeant Daniel Gilhully, and Officers Robert Nappe, Joseph Peterson, and Ed Vecellio–arrived at Jackman's home after Jackman had made a series of phone calls to the EHPD in which he used profanity and called police officers offensive names. When the officers entered Jackman's home, there was a struggle. While the officers were attempting to handcuff Jackman, they discovered he had a gun. Jackman testified that during the struggle he bit one of the officers on the hand, causing serious injury. Jackman testified that he was then beaten severely about the face and head by the officers, and had several teeth knocked out. At the end of the struggle, when Jackman was facedown on his bed, according to his testimony, one of the officers pointed his gun at Jackman's head and said "You're lucky you're not a nigger because you'd be fucking dead" and "in three days, you will be in [jail in New Haven] being butt fucked by the niggers."[3]

---

[3] Jackman admitted that although he had filed a lawsuit against the EHPD concerning this incident, he did not mention the racial remarks during his deposition or trial testimony. Jackman also testified that, in his suit against the EHPD and individual police officers, the jury ruled in

### 4.    T-Shirts

Plaintiff also relied in part on testimony about T-shirts worn by members of the EHPD. Chief Criscuolo testified that, "around the time of the [Jones] shooting," it came to his attention that members of the EHPD had been wearing T-shirts which depicted two white police officers holding two white suspects on the hood of a police car, with the phrase "Boyz on the Hood."[4] The officers wore these shirts while they were off-duty playing softball. Criscuolo testified that he thought the shirts were "in bad taste" and offensive to people of color. He learned about the T-shirts from someone he encountered while walking on the street, but he could not remember who it was or whether that individual worked for the Department. Criscuolo said he told the person he was not happy that officers were wearing these T-shirts and wanted it to stop, but did nothing further about the T-shirts at the time. He assumed the practice had stopped because he heard nothing further about it. Criscuolo stated that, in his opinion, he had sufficiently addressed the situation by telling the individual he encountered on the street that he wanted the officers to stop wearing the T-shirts.

In late April or early May 1997, an article appeared in a newspaper about the T-shirts. On May 27, Criscuolo circulated a memo to the EHPD, stating:

> It was recently brought to my attention that a T-Shirt that appeared to be representing sponsorship by this department was being worn by a baseball team comprised of some East Haven police officers.

---

favor of the Town and the individual officers.

[4] This phrase is apparently a reference to the John Singleton film, *Boyz n the Hood*, which examines the social problems faced by black residents of inner-city Los Angeles, including police abuse.

Before any display, inference, sponsorship, or representation of the East Haven Police Department is used, permission must first be obtained from the chief of police.

The T-shirts were discussed at a Board of Police Commissioners meeting on the night of May 27. The minutes of the meeting reflect that the chairman of the Board stated that the T-shirts offended him and asked Criscuolo if he had handled the situation. Criscuolo responded that he had.

**5.      Patricia Snowden**

Patricia Snowden, an African-American female, testified about two encounters with the EHPD in 1998 and 2000.

a. *1998 Summons.*  On September 27, 1998, Snowden was shopping in East Haven. After purchasing clothing, she returned to her car and drove out of the store's parking lot. As she was leaving the lot, Snowden noticed an EHPD cruiser following her. The officer continued to follow her for several blocks until she pulled into a gas station. When she stopped at the gas station, the officer instructed her to get out of the car and asked for a copy of her license and registration. The officer issued Snowden a ticket for failing to have car insurance, improper use of a registration marker, operating an unregistered vehicle, and operating a vehicle with a suspended license. Snowden admitted that her registration had expired. She testified that the other three charges were ultimately dismissed. Snowden testified that she believed she was followed by the officer because of her race, but she also stated that the police officer had a right to issue the tickets and that she did not think the tickets were issued because of her race.

b. *2000 Arrest.*  When Snowden was stopped by the EHPD in 1998, she was issued a summons that required her to appear in court. She failed to appear at her scheduled court

appearance because she was ill. As a result, on November 18, 1998, a warrant was issued for her arrest. On January 7, 2000, while Snowden was visiting her son in prison, a Connecticut State Trooper arrested her because of the outstanding warrant. As the trooper was transporting her, Snowden asked him to adjust her handcuffs, and she explained that she was diabetic and had heart disease. She then passed out and, when she awoke, was in the hospital. Around 11 p.m., the hospital discharged her, and Officer Kevin McCarthy of the EHPD transported Snowden to East Haven. When she was exiting the police van in East Haven, she fell to the ground and passed out. When she woke up, she heard the voices of four to five EHPD officers telling her to "get up, get up." She testified that she could not move, and that an officer dragged her into the police station and deposited her on a bench. Snowden testified that while she was at the police station, officers pushed, punched, and hit her. Snowden testified that during her time at the station, she passed out approximately five times. She stated that the officers would hit her and order her to "wake up, wake up." Snowden also testified that someone shocked her with an electronic device. Snowden testified that the officers got angry with her and repeatedly called her a "nigger" and a "bitch." She also testified that while she was in the station she was sexually assaulted by McCarthy and four or five other police officers. She explained that this assault consisted of officers attempting to pull her pants down and pulling at her bra. She also stated that when she left the station her shirt and bra were ripped and that she had bruises. Snowden was in the hospital for five to six days after the incident. When she got home from the hospital she had her daughter photograph bruises on her arms, legs, knee, and neck.

Snowden testified that she never reported this incident to the Chief of Police or to the Board of Police Commissioners. However, Snowden brought suit against the Town alleging

-10-

violation of her rights. At the time of the Jones trial, Snowden's suit against the Town was still pending.

### 6. Independent Investigation of the Jones Shooting

The shooting of Jones was investigated by the State of Connecticut. No evidence was received at trial as to the conclusions of the investigation. There was no evidence that any agency ever found Flodquist to be at fault in the incident or that any charges were brought against him relating to the incident.

## C. Verdict

The jury found that Flodquist had used excessive force against Malik Jones, but found in Flodquist's favor on the ground that he was entitled to qualified immunity.(A state officer who is sued under Section 1983 for violation of federal law is entitled to qualified immunity from suit if there was no clear law at the time giving him notice that the challenged conduct was in violation of federal law. *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).) The jury also found in favor of Flodquist on the Connecticut State law claims of battery, intentional infliction of emotional distress, and negligent infliction of emotional distress. As for Defendant DePalma, the jury found he had not violated Jones's constitutional rights by failing to intervene to protect Jones from Flodquist's use of excessive force.

The jury found the Town liable on the ground that the killing of Malik Jones resulted from an unconstitutional custom, policy, or usage of the Town.

## D. Post-Trial Motions & Judgment

After trial, the Town renewed its motion for judgment as a matter of law under Rule 50. The district court denied the Town's motion. The court concluded that Plaintiff had failed to

adduce sufficient evidence to satisfy two of her three theories of municipal liability under Section 1983, but had satisfied the third. According to the court's ruling, Plaintiff failed to establish a custom, policy, or usage of not disciplining EHPD officers for violating the constitutional rights of black people, or the creation of a hostile environment for black people through a practice of harassing, stopping, and interfering with them. The court, however, concluded that Plaintiff had established a custom, policy, or usage of deliberate indifference to abuse of the constitutional rights of African-Americans and other people of color, which resulted in the violation of Jones's constitutional rights.

The district court entered judgment for Plaintiff and this appeal followed. The Town contends the evidence was legally insufficient to show that the Town had a custom, policy, or usage of deliberate indifference to abuse of the rights of persons of color.[5]

**DISCUSSION**

**A.      Standard of Review**

We review *de novo* a district court's denial of a motion under Rule 50 for judgment as a matter of law. *Nimely v. City of New York*, 414 F.3d 381, 389-90 (2d Cir. 2005). A court may grant judgment against a party as a matter of law if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party . . . ." Fed. R. Civ. P. 50(a)(1). The court must consider the evidence in the light most favorable to the non-movant and "give that party the benefit of all reasonable inferences that the jury might have drawn in his favor

---

[5] On appeal the Town has also challenged the district court's decision to grant a new trial on the issue of compensatory damages and several of the court's evidentiary rulings in favor of Plaintiff. Plaintiff has filed a cross-appeal, arguing that the district court erred in striking the jury's award of punitive damages. These arguments are moot in light of our conclusion that the Town was entitled to judgment as a matter of law.

from the evidence." *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) (internal quotation marks omitted). A court may grant such a motion only if a reasonable jury "would have been compelled [by the evidence or lack of evidence] to accept the view of the moving party." *Id.* at 370-71 (emphasis and internal quotation marks omitted).

**B.      Municipal Liability Under Section 1983**

Title 42 U.S.C. § 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

Under the standards of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality. *Id.* at 690-91; *see also Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (municipalities can be held liable for "practices so persistent and widespread as to practically have the force of law"). Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee. *Monell*, 436 U.S. at 691; *Connick*, 131 S. Ct. at 1359 (citing *Monell*, 436 U.S. at 691); *see also Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997) ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged.").

Thus, isolated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify

municipal liability. *Villante v. Dep't. of Corr.*, 786 F.2d 516, 519 (2d Cir. 1986) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) (Brennan, J., concurring in part and concurring in the judgment)). On the other hand, such acts would justify liability of the municipality if, for example, they were done pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses.[6] *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125-26 (2d Cir. 2004). A plaintiff alleging that she has been injured by the actions of a low-level municipal employee can establish municipal liability by showing that a policymaking official ordered or ratified the employee's actions–either expressly or tacitly. *Id.* at 126; *see also Connick*, 131 S. Ct. at 1360 (a municipality's "'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution'" (quoting *City of Canton v. Harris*, 489 U.S. 378, 395 (1989) (O'Connor, *J.*, concurring in part and dissenting in part))). Thus, a plaintiff can prevail against a municipality by showing that the policymaking official was aware of the employee's unconstitutional actions and consciously chose to ignore them. *Amnesty Am.*, 361 F.3d at 126. A municipal policymaking official's "deliberate indifference" to the unconstitutional actions, or risk of unconstitutional actions, of municipal employees can in certain circumstances satisfy the test for a municipal custom, policy, or usage that is actionable under Section 1983. *See id.* at 126, 127 n. 8; *see also Brown*, 520 U.S.

---

[6] The word "supervisor" is used in this opinion to refer to persons in policy-making roles, whose misfeasance could trigger municipal liability under *Monell*.

at 407 ("[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.").

To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410. We have held that demonstration of deliberate indifference requires a showing that the official made a conscious choice, and was not merely negligent. *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011); *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). *See also City of Canton*, 489 U.S. at 396 (O'Connor, J., concurring in part and dissenting in part) ("Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied.").

**C.     Insufficiency of the Evidence Presented at Trial**

Given the standards summarized above, we conclude that the evidence Plaintiff presented at trial was insufficient as a matter of law to support a reasonable finding that Plaintiff's loss was attributable to a custom, policy, or usage of the Town of East Haven.

There are a number of different ways in which, given sufficient evidence, Plaintiff might have satisfied the burden of showing municipal liability under the standards of *Monell*. One

-15-

would be to show a sufficiently widespread practice among police officers of abuse of the rights of black people to support reasonably the conclusion that such abuse was the custom of the officers of the Department and that supervisory personnel must have been aware of it but took no adequate corrective or preventive measures (or some combination of the two). Another might be that officers of the Department expressed among themselves an inclination to abuse the rights of black people with sufficient frequency or in such manner that the attitude would have been known to supervisory personnel, which then took no adequate corrective or preventive steps. A third might be a showing of deliberate indifference on the part of supervisory personnel to abuse of the rights of black people, which was communicated to line officers so as to give them the sense that they could engage in such abuse of rights without risking appropriate disciplinary consequences. The trial evidence was not sufficient to support a finding against the Town on any such theory. Furthermore, the district court itself found, in ruling on the Town's motion for judgment as a matter of law, that Plaintiff failed to establish a custom, policy, or usage on the part of the Town of not disciplining EHPD officers for violating the constitutional rights of black people, or that the Town created a hostile environment for black people through a practice of harassing, stopping, and interfering with them, and Plaintiff has not suggested on appeal that those rulings were erroneous.

The evidence, construed (as it must be) in the manner most favorable to the Plaintiff, unquestionably showed instances of reprehensible and at times illegal and unconstitutional conduct by individual officers of the EHPD. But such a showing is not a sufficient basis for imposing liability on the municipality. To justify imposition of liability on the municipality, the Plaintiff needed to show that her loss was attributable to a custom, policy, or usage of the Town

-16-

or its supervisory officials. The trial evidence failed to make such a showing. The evidence failed to show a pattern of abusive conduct (or expressions of inclination toward such abusive conduct) among officers, so widespread as to support an inference that it must have been known and tolerated by superiors. It failed to show sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse. Nor was there evidence that supervisors communicated to officers an attitude of indifference to abuse so as to give the officers a sense of liberty to abuse rights.

In her effort to prove municipal liability, Plaintiff relied on the six incidents described above: the pursuit and arrest of Shane Gray, the racially charged comments made during the arrest of Donald Jackman, the T-shirt incident, the traffic stop of Patricia Snowden in 1998, the arrest and beating of Snowden in 2000, and the Jones shooting itself. Without doubt some of these incidents (viewed in the light most favorable to Plaintiff) would have justified imposition of liability under Section 1983 against the individual abusive officers. But they fail individually and in the aggregate to satisfy Plaintiff's burden of showing municipal liability. We review these six incidents one by one (and in the aggregate) to explain why.

The incident surrounding the arrest of Shane Gray gives little support to Plaintiff's case. The New Haven Police Department had sent out a bulletin advising that three unknown black males in their early twenties were wanted for armed robbery and provided a description and the license plate number of their vehicle. In these circumstances, it was not unreasonable for Flodquist to pursue Gray and use force to prevent him from escaping. *See, e.g.*, *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985) ("[I]f . . . there is probable cause to believe that [the suspect] has committed a crime involving the infliction or threatened infliction of serious physical harm,

deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."). Gray and Flodquist gave conflicting accounts of whether Flodquist ordered Gray to stop or gave any warning before shooting, and the jury could have credited Gray's account. Nonetheless there was no showing that a warning was feasible in those circumstances. In any event, regardless of whether the shooting could properly have been considered excessive force, there was no evidence to link the shooting with Gray's race.

The fact that Captain Criscuolo investigated the incident did not support an inference that he had "notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious." *Amnesty Am.*, 361 F.3d at 128. There was no evidence that he had reason to disbelieve Flodquist's account that he told Gray to stop before shooting, or reason to believe that a warning would have been feasible in the circumstances. Furthermore, Gray never complained to Criscuolo or any policy-maker until his trial testimony in this case. The jury could not infer any impropriety based on Criscuolo's failure to contact Gray in investigating the incident because there was no evidence that either EHPD procedure or prevailing norms among police departments required or even recommended interviewing a suspect in these circumstances. There was no reason, based on Flodquist's account, for Criscuolo or other policy-makers to believe Flodquist's conduct was either motivated by bias or unconstitutional. The Gray incident did not support an inference of tolerance of misconduct on the part of police supervisors.

The 1998 traffic stop of Patricia Snowden did nothing for Plaintiff's case. Snowden was followed, stopped, and given a ticket when she was driving a car whose registration had expired. There was no police misconduct of any kind in those actions. While it is true that Snowden

testified that she believed she was stopped by reason of racial bias, her testimony to that effect amounted to nothing more than unsupported speculation. She was not competent to testify to the officer's motivation, and there was no objective evidence giving any support to her speculation.

The incident surrounding the arrest of Jackman also did little for Plaintiff's case against the municipality. The investigating officers were justified in going to Jackman's home upon receipt of his strange, provocative phone calls. They found that he had a gun. Jackman behaved violently, biting an officer. Even if the officers' conduct in response involved excessive force, this showed no indifference to the rights of persons of color, as Jackman was Caucasian. The only aspect of the incident capable of assisting the Plaintiff's case was that one of the arresting officers made racially bigoted remarks to Jackman. However, there is no showing that any policy-maker was aware of those remarks. The evidence of the Jackman incident accordingly had no capacity to demonstrate that policy-makers of the Department were indifferent to racially motivated misconduct by police officers.

As for the killing of Jones, the facts were contested. On Plaintiff's version, Officer Flodquist shot Jones prior to the car moving in reverse – at a time when Flodquist had no reason to believe himself in danger. On Flodquist's version, he did not fire until he was in danger of being hit by the car speeding in reverse. While we must accept Plaintiff's version as true in ruling on the Town's motion for judgment as a matter of law, there is no basis in the evidence for concluding that Flodquist's supervisory officials did not accept as true his plausible version of the facts. As it is uncontested that Malik Jones was fleeing the police and was driving erratically and dangerously, Flodquist's supervisors had no reason to doubt his version of the facts. The incident was investigated by the State of Connecticut. Neither party introduced the results of that

-19-

investigation. As a jury could not reasonably find evidence in the trial below suggesting that the state investigation found fault with Flodquist's conduct, Plaintiff cannot contend that this incident supports an inference that Flodquist's superiors failed to discipline him after being on notice that he used excessive force against a black man.

Snowden's testimony (accepted as true) about her arrest in 2000 unquestionably depicted serious extreme hostility on the part of several officers to black people. Had there been evidence that superiors of the East Haven Police Department received a credible report of such conduct and made no investigation, such evidence could perhaps have contributed to Plaintiff's case, even though the incident occurred some three years after the Jones shooting. It is not unreasonable to infer that Town officials who were indifferent to such abuse in 2000 might have held similar attitudes three years earlier. But we need not rule on retroactive attribution of indifference in 2000 to events in 1997. A showing of indifference to abuse of the rights of black people would depend in part on a showing that, upon receipt of a credible report of such abuse, superiors took no investigative or corrective action. Plaintiff made no showing that the Department failed to take appropriate action after learning of Snowden's allegations.[7]

The only evidence that supported any inference about the attitude of supervisors toward black people was the T-shirt incident. This evidence showed that Chief Criscuolo learned that officers playing baseball had been wearing a T-shirt that exhibited an attitude that was disrespectful of black people and he took no action to put a stop to it.

_____

[7] Nor did Plaintiff submit evidence that the Department failed to investigate Snowden's allegations after they were revealed by the suit.

While this evidence could support some inferences about the attitude of the Chief of Police toward black people, it was nonetheless insufficient to support Plaintiff's case for several reasons. First, while the message of the T-shirts was *disrespectful* of black people, it did not reveal an inclination on the part of officers to *abuse the rights* of black people. Second, it was not clear that the police chief was entitled by law to order officers not to wear a T-shirt expressing their personal views while playing baseball off-duty.[8] The Chief's failure to take action accordingly did not demonstrate a tolerance for abuse of the rights of black people. Thus the evidence of the T-shirt incident did not support a finding that officers were aware of any tolerance on the part of the Chief for abuse of rights of black people.

In sum, Plaintiff's evidence showed two instances, or at the most three, over a period of several years in which a small number of officers abused the rights of black people, and one incident in which an officer indicated a disposition to abuse the rights of black people. This evidence fell far short of showing a policy, custom, or usage of officers to abuse the rights of black people, and far short of showing abusive conduct among officers so persistent that it must have been known to supervisory authorities. It showed no instances in which supervisors were aware of abuse, or of a high probability of abuse, but failed to take corrective or preventive action. And it showed no instance in which supervisory personnel exhibited indifference to abuse of the rights of black people.

While any instance in which police officers abuse people's rights is intolerable, the question before us in this appeal is whether Plaintiff's evidence was sufficient to support a

---

[8] *Pappas v. Giuliani*, 290 F.3d 143 (2d Cir. 2002) was not decided until several years after this incident.

finding of liability of the Town under the standards of *Monell*. Notwithstanding Plaintiff's showing of some instances of abusive conduct by a few officers, Plaintiff failed to put forth evidence that can justify imposition of liability on the municipality.

We therefore conclude that the Town was entitled to the grant of its motion for judgment as a matter of law, and that the district court erred in denying its motion. We therefore remand to the district court with instructions to vacate the judgment in favor of Plaintiff and to enter judgment in favor of the Town.

## CONCLUSION

The judgment for Plaintiff against the Town of East Haven is **REVERSED**. The case is remanded to the district court with instructions to enter judgment in favor of the Town.