David McKAY, Plaintiff,

v.

The CITY OF NEW YORK,
et al., Defendants.

No. 13 Civ. 2948(JGK).

United States District Court,
S.D. New York.

Signed July 24, 2014.

500

Ronald Podolsky, New York, NY, for Plaintiff.

Tobias Eli Zimmerman, Tobias Eli Zimmerman, City of New York Law Department, New York, NY, for Defendants.

## OPINION AND ORDER

JOHN G. KOELTL, District Judge:

Plaintiff David McKay brings this action against the City of New York ("the City"), Michael Bloomberg, Raymond Kelly, and Officer Harry Perez, alleging false arrest, false imprisonment, and malicious prosecution under 42 U.S.C. § 1983.[1] On June 1, 2012, Defendant Perez arrested the plaintiff for trespass after Perez and other officers encountered the plaintiff in the vestibule of an apartment building at 105 Charles Street in Manhattan. The plaintiff was held in custody for approximately three hours, and then released. On June 21, 2012, Perez signed a criminal complaint charging the plaintiff with criminal trespass. The plaintiff made multiple court appearances before the charge was dismissed on speedy trial grounds. In this action, the plaintiff alleges that he was arrested and prosecuted without probable cause, and that his prosecution was motivated by malice. Presently before the Court is the defendants' motion for summary judgment dismissing the plaintiff's claims. For the reasons explained below, the defendants' motion is granted.

### I.

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir.1994). The moving party bears the initial burden of "informing the district court of the basis

---

1. The Complaint contains an additional cause of action styled as a claim for the deprivation of due process and equal protection, but the plaintiff has withdrawn this claim.

for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify the material facts and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether summary judgment is appropriate, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also Gallo,* 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994); *see also Perez v. Duran,* 962 F.Supp.2d 533, 535–36 (S.D.N.Y.2013).

## II.

Unless otherwise noted, the following facts are not in dispute.

### A.

Plaintiff McKay is a professional musician who resides in New York. (Aff. of David McKay ("McKay Aff.") ¶ 2; Compl. ¶ 2.) Defendant Perez is a New York City police officer who was assigned to the Sixth Precinct in Manhattan during the events relevant to this action. (Compl. ¶ 6.) Defendant Bloomberg was the Mayor of New York City and Defendant Kelly was the Police Commissioner of New York City when the relevant events occurred. (Compl. ¶¶ 4, 5.)

### B.

At approximately 3:00am on the evening of June 1, 2012, the plaintiff finished a performance at the Fat Cat Club in Manhattan. (*See* McKay Aff. ¶ 2.) After the performance, the plaintiff met a woman at a deli, left the deli with her, and had a conversation with her while sitting on the steps in front of the entrance of the residential building at 105 Charles Street. (McKay Aff. ¶ 2.) The conversation lasted approximately an hour and a half. (McKay Aff. ¶ 3.) After the conversation, the woman left. (McKay Aff. ¶ 3.) The plaintiff alleges that sitting on the steps had exacerbated an existing back injury, and that in order to relieve his back pain he entered the vestibule of the building at 105 Charles Street and sat down with his back against the wall. (Decl. of Tobias E. Zimmerman in Supp. of Defs.' Mot. for Summ. J. ("Zimmerman Decl."), Ex. E ("McKay Dep.") at 6; McKay Aff. ¶ 3.)

The vestibule was separated from the street by four or five steps, and the door to the vestibule was unlocked. (McKay Aff. ¶¶ 2–4; McKay Dep. at 25; *see also* Zimmerman Decl., Ex. F.) The vestibule contained an "intercommunication device whereby persons seeking entrance to the secure part of the building could be admitted by response by tenants." (McKay Aff. ¶ 4.) It did not contain any posted "no trespassing" sign.[2] (McKay Aff. ¶ 13.)

---

**2.** The lack of a "no trespassing" sign in the vestibule is a disputed fact, which some evidence in the record tends to contradict. (*See* Zimmerman Decl., Ex. H.) For purposes of the present motion, the facts must be construed in the light most favorable to the non-moving party, and the Court therefore as-

### C.

At 4:51am on June 1, 2012, a 911 operator received a call from a female caller who reported that a man was sleeping in the doorway of the building at 105 Charles Street. (*See* Zimmerman Decl. ¶ 5 & Ex. D.) Defendant Perez and other officers from the Sixth Precinct responded to this call and arrived at 105 Charles Street at 4:52am. (*See* McKay Dep. at 37–38; Zimmerman Decl. ¶ 5 & Ex. D.) The plaintiff alleges that he had been in the vestibule for about ten minutes before the officers arrived. (McKay Aff. ¶ 5.) When the officers arrived, the plaintiff's eyes were closed. (McKay Dep. at 27.) The officers knocked on the door and pushed at the door. (McKay Dep. at 27.) The door pushed against the plaintiff's leg. (McKay Dep. at 27.) The plaintiff then got up and opened the door. (McKay Aff. ¶ 5; McKay Dep. at 27.) The officers questioned the plaintiff about drug dealing activities, which the plaintiff denied, and the officers then handcuffed the plaintiff, placed him under arrest, and escorted him to the Sixth Precinct station, which is located across the street from 105 Charles Street. (McKay Aff. ¶ 6; McKay Dep. at 6; Zimmerman Decl. ¶ 6.) At the station, the plaintiff was fingerprinted, photographed, and placed in a holding cell. (McKay Aff. ¶ 7; McKay Dep. at 12, 74.)

Defendant Perez completed and signed an arrest Report that indicates that the plaintiff was arrested at 5:03am for trespass, a violation under New York Penal Law § 140.05. (*See* Zimmerman Decl., Ex. B.) The plaintiff spent approximately three hours in custody, and was then issued a Desk Appearance Ticket and released. (McKay Aff. ¶ 8; Zimmerman Decl., Ex. C.) The Desk Appearance Ticket listed New York Penal Law § 140.05 as the offense charged and required the plaintiff to

appear in New York County Criminal Court on July 9, 2012 to answer the charge. (Zimmerman Decl., Ex. C.) It did not impose any travel restrictions on the plaintiff. (*See* Zimmerman Decl., Ex. C; *see also* McKay Dep. at 21–22.)

### D.

On June 21, 2012, Defendant Perez signed a criminal complaint charging the plaintiff with criminal trespass in the second degree, a misdemeanor under New York Penal Law § 140.15. (*See* Zimmerman Decl., Ex. H.) The complaint states that Perez "observed [the plaintiff] inside the vestibule of a dwelling, an apartment building where people reside, at [105 Charles Street], laying down and sleeping, and ... said location is beyond a posted sign which read, NO TRESPASSING." (Zimmerman Decl., Ex. H.) It further states that the plaintiff is not a tenant at 105 Charles Street, and that the plaintiff was unable to provide the name of a resident who had invited him onto the premises. (Zimmerman Decl., Ex. H.) Finally, it states that Perez

> determined that [the plaintiff] did not have permission or authority to be inside the dwelling based on information and belief the source of which is as follows: [Perez] is informed by Joseph Jackson, of an address known to the District Attorney, that [Jackson] is an agent of this dwelling and [the plaintiff] did not have permission or authority to enter or remain in the area in which he/she was found.

(Zimmerman Decl., Ex. H.)

On July 11, 2012, Jackson signed a "supporting deposition" pursuant to New York Criminal Procedure Law § 100.20 affirming that the facts attributable to him in the June 21, 2012 criminal complaint were

---

sumes that there was no "no trespassing" sign in the vestibule.

true. (Zimmerman Decl., Ex. I.) Beneath his signature on the printed form, Jackson hand-wrote the following:

> I am the owner of 105 Charles Street. It is true that the [plaintiff] did not have permission or authority to enter and remain in the vestibule of my building. However I did not speak to a police officer regarding this matter.

(Zimmerman Decl., Ex. I.)

### E.

When the plaintiff appeared before a New York County Criminal Court judge on July 9, 2012 pursuant to the Desk Appearance Ticket, the plaintiff rejected a plea offer from the prosecution. (*See* McKay Aff. ¶ 13; McKay Dep. at 17–18.) The plaintiff then made four additional court appearances—on August 23, October 15, November 7, and November 30, 2012—before the charge against him was dismissed on speedy trial grounds. (*See* McKay Aff. ¶ 13; McKay Dep. at 22; Zimmerman Decl., Ex. J, Ex. K.) No travel restrictions were imposed on the plaintiff at any time in connection with the charge against him. (*See* McKay Dep. at 21–22.)

### F.

The plaintiff filed this lawsuit on May 2, 2013, claiming false arrest, false imprisonment, and malicious prosecution against Defendants Perez, Kelly, Bloomberg, and the City. The defendants now move for summary judgment on all claims.

### III.

The plaintiff asserts claims for false arrest and false imprisonment under 42 U.S.C. § 1983. In New York, false arrest and false imprisonment "are two names for the same tort." *Biswas v. City of New York*, 973 F.Supp.2d 504, 515 (S.D.N.Y.2013) (quoting *Holland v. City of Poughkeepsie*, 90 A.D.3d 841, 935 N.Y.S.2d 583, 589 (2011)).

Section 1983 claims for false arrest are "substantially the same" as false arrest claims under New York law. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). In New York, false arrest claims require a showing that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Id.* at 853 (citations omitted); *see also Pelayo v. Port Auth.*, 893 F.Supp.2d 632, 639 (S.D.N.Y. 2012).

An arrest of a criminal suspect by a law enforcement officer with probable cause is a "privileged" confinement even if it is non-consensual. *Decker v. Campus*, 981 F.Supp. 851, 856 (S.D.N.Y.1997). Thus, for arrests by law enforcement officers, "[t]he existence of probable cause to arrest constitutes a complete defense to an action for false arrest, whether that action is brought under Section 1983 or state law." *Matthews v. City of New York*, 889 F.Supp.2d 418, 433 (E.D.N.Y.2012) (citation and internal quotation marks omitted); *see also Weyant*, 101 F.3d at 852; *Biswas*, 973 F.Supp.2d at 515.

An officer has probable cause for an arrest when at the time of the arrest "the facts and circumstances within [his] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) (citation omitted); *see also Garrett v. City of New York*, No. 10cv2689, 2011 WL 4444514, at *4 (S.D.N.Y. Sept. 26, 2011). Once the fact of a warrantless arrest has been established, the burden is on

the arresting officer to prove probable cause for the arrest by a preponderance of the evidence. *Garrett*, 2011 WL 4444514, at *4.

■■■■ Even if an officer did not have probable cause for an arrest, the officer may still be shielded from liability for false arrest under the doctrine of qualified immunity. Qualified immunity protects government officials performing discretionary functions, such as arrests, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Plumhoff v. Rickard,* —— U.S. ——, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014); *Ashcroft v. Iqbal,* 556 U.S. 662, 672, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."). "Requiring the alleged violation of law to be clearly established balances the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Wood v. Moss,* —— U.S. ——, 134 S.Ct. 2056, 2067, 188 L.Ed.2d 1039 (2014) (citation and internal quotation marks omitted). As the Supreme Court has explained, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (citation omitted), *overruled on other grounds by*

*Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

■■■■ In the case of an arrest, an officer is entitled to qualified immunity if he had "arguable probable cause" to make the arrest, which means that "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Amore v. Novarro,* 624 F.3d 522, 536 (2d Cir.2010) (citation omitted). " '[A]rguable probable cause' . . . focus[es] attention on the word 'clearly' established law, and [shields an] officer[ from liability] if reasonable officers could disagree as to what the law is." *Torraco v. Port Auth.,* 539 F.Supp.2d 632, 651 (E.D.N.Y.2008), *aff'd,* 615 F.3d 129 (2d Cir.2010).

### A.

In this case, Defendant Perez arrested the plaintiff for trespass, a violation under New York Penal Law § 140.05. Under the statute, "[a] person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises." N.Y. Penal Law § 140.05. A person is licensed or privileged to enter or remain on premises that are "open to the public" unless that person "defies a lawful order not to enter or remain" on the premises. *Id.* § 140.00(5). It is undisputed that the plaintiff had not received a lawful order "not to enter or remain" on the premises at 105 Charles Street when Perez encountered him there. Thus, the question of whether he was trespassing at the time of his arrest turns on whether the vestibule where he was found was "open to the public." The parties dispute the meaning of this term and its applicability to the premises on which the plaintiff was arrested.

There is no bright-line rule for determining when premises are "open to the

public" under the meaning of the New York trespass statute. *See Davis v. City of New York,* 373 F.Supp.2d 322, 332 (S.D.N.Y.2005). New York courts have looked to a number of factors, including:

the type of building involved; who owned the building; whether such ownership was posted or advertised; the physical condition and general appearance of the building; the purpose, if any, for which it was being used; whether members of the public were expressly or impliedly invited to enter; whether the public moved freely in and out of the building; whether doors and windows of the building were intact and were closed, locked or blocked; and whether any warning signs were conspicuously posted; as well as any other evidence which might have some bearing on the[ ] determination in this regard.

*Mitchell v. City of New York,* No. 12cv2674, 2014 WL 535046, at *4 (S.D.N.Y. Feb. 11, 2014) (quoting *People v. Taylor,* 114 Misc.2d 680, 452 N.Y.S.2d 526, 528–29 (Sup.Ct.1982))[3]; *see also People v. Scott,* 8 Misc.3d 428, 797 N.Y.S.2d 847, 850 (Crim. Ct.2005) ("[T]he test must be whether in light of common experience it is understood that the area is not open to the general public.").

When viewed in the light most favorable to the plaintiff, the record in this case indicates that the plaintiff was sitting with his eyes closed on the floor of a vestibule of an apartment building with an unlocked

door and no "no trespassing" sign posted when Defendant Perez and an unspecified number of other officers encountered him. When questioned, the plaintiff said that he had been "hanging out with a girl" who lived in the next building. (McKay Dep. at 8.) The defendants argue that under the totality of the circumstances, it was objectively reasonable for Perez to have concluded that the vestibule in which he found the plaintiff was not "open to the public" at the time of the arrest. The plaintiff argues that no reasonable officer could conclude that an unlocked vestibule without a posted "no trespassing" sign is closed to the public.[4]

New York courts have generally considered common areas of residential apartment buildings to be "closed to the public" if they are behind locked doors or if they contain posted "no trespassing" signs. *See, e.g., People v. Babarcich,* 166 A.D.2d 655, 561 N.Y.S.2d 255, 256 (1990) ("[T]he officer was justified in concluding that the defendant in fact had no privilege to be on the premises of the apartment complex which, in light of the 'no trespassing' sign, the officer reasonably considered as being closed to the general public."), *appeal denied,* 76 N.Y.2d 1019, 565 N.Y.S.2d 769, 566 N.E.2d 1174 (1990); *People v. Torres,* 162 A.D.2d 385, 556 N.Y.S.2d 920, 921 (1990) (finding that an officer was reasonable in concluding that a hallway was not "open to the public" where "[t]he apartment building in ques-

---

**3.** While the plaintiff argued that the *Taylor* factors have been legislatively overruled, there is no basis for that assertion. The definition of "enter or remain unlawfully" in New York Penal Law § 140.00(5) has not been changed since *Taylor* was decided, and the *Taylor* factors were recently relied upon in *Mitchell.*

**4.** The plaintiff also argues that the 911 call alleged by the defendants to have been the reason why the officers responded to the

scene of 105 Charles Street was fabricated as a pretext for arresting the plaintiff. However, the plaintiff has presented no evidence to respond to the evidence of the 911 call. (*See* Zimmerman Decl. ¶ 5 & Ex. D.) In any event, probable cause is based on what the arresting officer knew at the time of the arrest, *Garrett,* 2011 WL 4444514, at *4, and Defendant Perez's personal observations were consistent with the 911 call.

tion ... was locked at the front door and ... [t]here was also a 'No Trespassing' sign in both English and Spanish posted at the entrance"), *appeal denied,* 76 N.Y.2d 895, 561 N.Y.S.2d 558, 562 N.E.2d 883 (1990). By the same token, where these features are absent, common areas such as lobbies, hallways, and vestibules are often viewed as "open to the public." *See, e.g., People v. Outlar,* 177 Misc.2d 620, 677 N.Y.S.2d 430, 433 (Crim.Ct.1998) ("The information does not allege defendant passed through a locked door, a buzzer and intercom system, or any other physical separation or barrier that would suggest the hallway was closed to the public.... An allegation that defendant was in the hallway, without any indication he entered through a locked entrance, is insufficient to support an unlawful entry charge." (collecting cases)).

On the other hand, some New York cases have not viewed the presence or absence of a locked door or a "no trespassing" sign as dispositive of whether premises are "open to the public." Rather, such courts have looked to all of the characteristics of the premises involved and the circumstances of the alleged trespasser's presence upon the premises—including the purpose for which the premises are being used, whether members of the public are expressly or impliedly invited to enter, and whether the alleged trespasser is present for a purpose for which the public is impliedly licensed to enter. Thus, in *Scott,* the court found that the unlocked lobbies of apartment buildings behind unlocked vestibules were

> not necessarily open to the general public. The residents of an apartment

building ... are entitled to expect that common areas of their homes are open only to people with a legitimate reason for entering. Such people include (but are not necessarily limited to) residents, guests of residents, deliverymen, and friends and relatives of residents who have been told by residents that they are welcome to visit without a specific invitation. But the lobby of an apartment building is not a place open to anybody who is there for no legitimate reason at all.

797 N.Y.S.2d at 850. The court specifically disagreed with cases that had concluded that "a lock, 'no trespass' sign, or some 'physical barrier' is necessary to give the general public fair notice that it is unwelcome in the lobby of an apartment building." *Id.* at 851 (citation omitted).[5] Other cases, similarly, have not viewed the presence or absence of locked doors or "no trespassing" signs as dispositive of whether premises are open to the public. *See People v. Jiminez,* 22 Misc.3d 129(A), 880 N.Y.S.2d 226, at *1 (Sup.Ct.App.Term 2008) (per curiam) (noting that the defendant was found in the vestibule of a building indiscriminately ringing buzzers and that he could not identify whom he was visiting, and concluding on this basis, without mentioning whether the door was locked or a "no trespassing" sign was posted, that the vestibule was not "open to the public"); *People v. Rodriguez,* 159 A.D.2d 201, 552 N.Y.S.2d 13, 14 (1990) (finding that it was reasonable to conclude that a stairwell was not open to the general public when it was behind two closed doors, but making no mention of locks or "no

---

**5.** While there were "no trespassing" signs in each of the four criminal complaints at issue in *Scott,* the court plainly did not find the presence of those signs to be a dispositive factor. The court also noted in dicta that a "lobby through which one must walk to reach a store or a buzzer system would not be private." *Id.* at 851. However, the court had no occasion to consider whether such a lobby would be open to the public for a purpose other than a plainly intended use.

trespassing" signs), *appeal denied,* 76 N.Y.2d 742, 558 N.Y.S.2d 904, 557 N.E.2d 1200 (1990).

In *People v. Powell,* the Court of Appeals concluded that a defendant who had been apprehended in a private office building after business hours was not on premises "open to the public," even though the front door was unlocked. 58 N.Y.2d 1009, 461 N.Y.S.2d 1012, 448 N.E.2d 797, 797–98 (1983). The Court concluded that a jury could find from the evidence that, although the defendant's entry was licensed, the defendant "was not licensed to remain because it was apparent . . . from the time of the day and the absence of any persons in the reception area or individual offices that the building was not 'at the time open to the public.'" *Id.,* 461 N.Y.S.2d 1012, 448 N.E.2d at 798. Although *Powell* lends some support to the view that an unlocked common area without a "no trespassing" sign can be closed to the public for purposes of the trespass statute, the premises and factual circumstances are very different from those involved in this case.

The New York Court of Appeals has not otherwise interpreted the phrase "open to the public" under § 140.00(5) in any relevant context, and it has not resolved the tension among courts that have disagreed about the significance of locked doors and "no trespassing" warnings in determining whether premises are "open to the public." *Compare Scott,* 797 N.Y.S.2d at 850, *with Outlar,* 677 N.Y.S.2d at 433.

### B.

■ Ultimately, this uncertainty in the meaning of the term "open to the public" in the New York trespass statute requires a finding that Defendant Perez is entitled to qualified immunity, and that the false arrest claim against him must be dismissed. In order to overcome a qualified immunity defense, a plaintiff must show that, taken in the light most favorable to the plaintiff, the facts alleged indicate that the officer's conduct violated a constitutional right, and that the right allegedly violated was "clearly established." *See Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.

■ In this case, there is no question that the plaintiff had a right not to be arrested without probable cause; this principle of constitutional law is clearly established. *See Ricciuti v. N.Y. City Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997). However, the Supreme Court has emphasized that the inquiry into whether the governing law was clearly established must be undertaken at a more granular level. *See Saucier,* 533 U.S. at 201, 121 S.Ct. 2151 ("This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition."); *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("The relevant question . . . is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed."); *see also Chipperini v. Crandall,* 253 F.Supp.2d 301, 307–09 (D.Conn. 2003) (noting that the inquiry into clearly established law in the context of a warrantless arrest required an analysis of the state criminal statute that a plaintiff-arrestee was suspected by her arresting officers of having violated). Law is "clearly established" for qualified immunity purposes if "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand. . . ." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151.

New York courts are not in agreement as to the meaning of the phrase "open to the public" in the context of common areas

of residential buildings. Some courts have concluded that premises could be "open to the public" for certain purposes, but not others. *See Jiminez*, 880 N.Y.S.2d, at *1; *Scott*, 797 N.Y.S.2d at 850. Under these cases, an officer could reasonably conclude that a vestibule is not "open" to someone who uses it as a place to sleep or rest, even if it could be "open" for other purposes, such as using an intercom system, waiting to visit a resident, or delivering a package. On the other hand, some courts have employed a less flexible test, concluding that in the absence of locked doors or "no trespassing" signs, a defendant has a license to remain on premises until the defendant receives a lawful order to leave. *See, e.g., Outlar*, 677 N.Y.S.2d at 433. Under these cases, a defendant who is found in a hallway or vestibule without any indication that he passed by a locked door or a "no trespassing" sign is not trespassing.

 The New York Court of Appeals has not defined the phrase "open to the public" in factual circumstances similar to this case, and the cases proffered by the parties do not establish whether there was probable cause for the plaintiff's arrest. The cases nevertheless do provide a basis for reasonable officers to disagree as to whether there was probable cause to arrest the plaintiff for trespass. Accordingly, there was arguable probable cause to arrest the plaintiff. *Cf. Campbell v. Peters*, 256 F.3d 695, 701–02 (7th Cir.2001) (noting that for purposes of an Eighth Amendment claim under § 1983, a lack of opinions from the state courts as to the meaning of a state statute limiting the term of prison sentences required a finding of qualified immunity); *Torraco*, 539 F.Supp.2d at 651 (finding the defendants entitled to qualified immunity because reasonable officers could disagree about the meaning of a federal statute that was argued to have shielded the plaintiff-arrestee from criminal liability). Defendant Perez is therefore entitled to qualified immunity, and his motion for summary judgment on the plaintiff's false arrest claim must be granted.[6]

## IV.

The plaintiff also brings a claim for malicious prosecution. On June 21, 2012, De-

---

**6.** Until recently, the Supreme Court had required a court considering a qualified immunity defense to address whether a constitutional violation had occurred before proceeding to the determination of whether a reasonable officer in the defendant's position should have known that he was violating the plaintiff's clearly established rights. *See Pearson*, 555 U.S. at 232, 129 S.Ct. 808 (discussing the approach mandated by the Supreme Court in *Saucier*, 533 U.S. 194, 121 S.Ct. 2151). In *Pearson*, the Supreme Court held that under certain circumstances, a court addressing a qualified immunity defense could forgo the inquiry into whether a constitutional violation had actually occurred and proceed directly to the question of whether a reasonable officer in the defendant's position should have known he was violating the plaintiff's clearly established constitutional rights. 555 U.S. at 236, 129 S.Ct. 808. One such set of circumstances occurs when a court can "rath-er quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all." *Id.* at 239, 129 S.Ct. 808. Another such set of circumstances occurs when a constitutional decision would rest on an "uncertain interpretation of state law." *Id.* at 238, 129 S.Ct. 808. In this case, both rationales for avoiding the constitutional question are present. A determination of whether there was *actual* probable cause for the plaintiff's arrest would require an uncertain interpretation of state law. Further, it is readily apparent that there was no violation of clearly established law because the defendant officer's belief that the plaintiff was trespassing has some support in state case law. There is therefore no requirement to reach the question of whether Perez had actual probable cause to believe that the plaintiff was trespassing.

fendant Perez signed a criminal complaint charging the plaintiff with criminal trespass in the second degree, a class A misdemeanor under New York Penal Law § 140.15. The plaintiff then made five court appearances pursuant to this charge before the complaint was dismissed on speedy trial grounds. The defendants argue that the record does not establish the lack of probable cause, actual malice, or a deprivation of liberty that amounts to a seizure under the Fourth Amendment, and that therefore the claim for malicious prosecution against Perez must be dismissed.

■■■ To establish a claim for malicious prosecution under § 1983, a plaintiff must establish the elements of a malicious prosecution claim under New York state law, as well as a violation of the plaintiff's rights under the Fourth Amendment. *Manganiello v. City of New York,* 612 F.3d 149, 160–61 (2d Cir.2010). A claim for malicious prosecution under New York state law requires "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Id.* at 161 (internal citation and quotation marks omitted). A claim for malicious prosecution under § 1983 requires the additional element of "(5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. N.Y. City Transit Auth.,* 215 F.3d 208, 215 (2d Cir.2000); *Perez,* 962 F.Supp.2d at 540.

■■■ The defendants argue that because Defendant Perez had probable cause to arrest the plaintiff, he also had probable cause to initiate the prosecution against him, and the plaintiff therefore cannot establish that probable cause to initiate his prosecution was lacking. The existence of probable cause is a complete defense to a claim of malicious prosecution in New York. *Manganiello,* 612 F.3d at 161–62; *Cooper v. City of New Rochelle,* 925 F.Supp.2d 588, 611 (S.D.N.Y.2013). Indeed, "a malicious prosecution claim will be defeated by a finding of probable cause to arrest, unless the plaintiff can demonstrate mitigating facts to vitiate probable cause which were first uncovered after the arrest." *Carson v. Lewis,* 35 F.Supp.2d 250, 263 (E.D.N.Y.1999) (citation omitted); *see also Cooper,* 925 F.Supp.2d at 611; *Dukes v. City of New York,* 879 F.Supp. 335, 342 (S.D.N.Y.1995).

■■■ Similarly, an officer is entitled to qualified immunity against a claim of malicious prosecution if the officer had arguable probable cause to arrest the plaintiff. *See Betts v. Shearman,* 751 F.3d 78, 83 (2d Cir.2014). "[B]ecause the focus of the qualified immunity inquiry is on the objective reasonableness of the defendant's actions, motivation does not come [into] play" when there is arguable probable cause. *Bonide Prods., Inc. v. Cahill,* 223 F.3d 141, 146 (2d Cir.2000) (per curiam) (citation omitted). Thus, an officer who is objectively reasonable in believing he has probable cause to arrest is entitled to qualified immunity on a claim for malicious prosecution "regardless of [any] allegations of malicious motivation," *id.,* as long as the officer does not learn of facts after the arrest "that would negate his . . . earlier determination of probable cause." *Cooper,* 925 F.Supp.2d at 611.

■■■ In this case, Defendant Perez had arguable probable cause to arrest the plaintiff for trespass, and he therefore had arguable probable cause to initiate a prosecution for trespass against the plaintiff unless he learned facts at some point after the arrest that would negate any objectively reasonable basis for probable

cause.[7] The record yields a reasonable inference that Perez undertook some form of investigation into the trespass charge after the arrest. However, there is no indication that Perez learned of any facts that would undermine the existence of arguable probable cause based on his personal observations at the time of the arrest. The criminal complaint added a couple of items of information, the veracity of which is disputed, and which, if true, would have supported probable cause rather than undermining it. For example, the criminal complaint alleges that there was a "no trespassing" sign. The criminal complaint also alleges that the arresting officer was informed by an agent of the owner of the apartment building at 105 Charles Street that the plaintiff did not have permission or authority to enter or remain in the area in which the plaintiff was found. While the agent subsequently affirmed the truth of that statement, the agent denied ever giving the statement to a police officer. Eliminating this additional information would still leave Perez with arguable probable cause to have arrested the plaintiff and to have signed a criminal complaint. The plaintiff does not point to any other facts that Perez might reasonably have come to know in the period between the arrest and the initiation of the prosecution that could have undermined the existence of arguable probable cause. Accordingly, Perez had arguable probable cause to initiate a prosecution for trespass against the plaintiff.

Because Perez had arguable probable cause to initiate the prosecution against the plaintiff for trespass, there is no occasion to reach the question of whether the prosecution was motivated by malice, *see Bonide Prods.*, 223 F.3d at 145 ("As it was objectively reasonable for [the officer] to believe that he had probable cause to [initiate proceedings] against [the plaintiff], we need not consider the other elements of the malicious prosecution claim."), and no occasion to resolve the dispute between the parties as to whether the court appearances made by the plaintiff amounted to a seizure. *See Cooper*, 925 F.Supp.2d at 611 ("The existence of probable cause is a complete defense to a claim of malicious prosecution in New York." (citation omitted)). Perez has established that he is shielded by qualified immunity from liability on the malicious prosecution claim, and the malicious prosecution claim against him must therefore be dismissed.

## V.

The plaintiff also alleges claims against former Police Commissioner Raymond Kelly, former Mayor Michael Bloomberg, and the City. The defendants argue that there is insufficient evidence in the record to raise a material issue of fact as to the personal involvement of Defendants Kelly and Bloomberg in the alleged constitutional violations, and also insufficient evidence to establish that a municipal policy or custom caused the plaintiff's alleged injuries.

---

7. The plaintiff was arrested for trespass, a violation under New York Penal Law § 140.05, and was later charged in the criminal complaint with criminal trespass in the second degree, a class A misdemeanor under New York Penal Law § 140.15. These two provision differ only in that § 140.05 requires a defendant to have "knowingly enter[ed] or remain[ed] unlawfully *in or upon premises*," whereas § 140.15 requires a defendant to have "knowingly enter[ed] or remain[ed] unlawfully *in a dwelling*." N.Y. Penal Law §§ 140.05 & 140.15 (emphasis added). It is undisputed that the premises where the plaintiff was found constituted a dwelling, and the difference between the offense of arrest and the offense for which the plaintiff was prosecuted is therefore immaterial for present purposes.

## A.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Back v. Hastings On Hudson Union Free School Dist.*, 365 F.3d 107, 122 (2d Cir.2004) (citation omitted); *see also Hollins v. City of New York*, No. 10cv1650, 2014 WL 836950, at *12 (S.D.N.Y. Mar. 3, 2014). The plaintiff alleges that Defendants Kelly and Bloomberg were personally involved in the alleged constitutional violations by establishing a policy of using boilerplate language for trespass complaints. While it is true that the personal involvement of a supervisory official can be established by showing that the official created a "policy or custom under which unconstitutional practices occurred," *Hollins*, 2014 WL 836950, at *13, there is no evidence in the record to support the allegation that a policy created by Kelly or Bloomberg had anything to do with the arrest or prosecution of the plaintiff.

With respect to the false arrest claim, the use of boilerplate language in a criminal complaint is irrelevant, because the alleged unconstitutional seizure occurred prior to the filing of the criminal complaint and therefore could not have been caused by it. *See, e.g., Kia P. v. McIntyre*, 235 F.3d 749, 761 (2d Cir.2000) ("In all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury." (citation omitted)).

With respect to the malicious prosecution claim, the plaintiff alleges that Defendant Perez used boilerplate language in the criminal complaint pursuant to the "Trespass Affidavit Program" because Perez was operating under the mistaken view that the building at 105 Charles Street was participating in the program, and that this caused Perez to include in-formation in the criminal complaint that was false. However, while Perez may have filled in or signed a form complaint, there is no evidence to suggest that Kelly or Bloomberg was responsible for establishing a policy of using such forms, or that such a policy included using false information to complete the form. Accordingly, there is no evidence to support the personal involvement of either Kelly or Bloomberg in the alleged constitutional violations, and the claims against these defendants must be dismissed. *See, e.g., Brocuglio v. Proulx*, 324 Fed.Appx. 32, 35 (2d Cir.2009) (summary order); *Hopkins v. DeStefano*, No. 07cv1742, 2009 WL 4349535, at *11 (D.Conn. Nov. 25, 2009); *Younger v. City of New York*, 480 F.Supp.2d 723, 733 (S.D.N.Y.2007).

## B.

The plaintiff also brings his claims against the City. To impose § 1983 liability upon a municipality, a plaintiff must identify a municipal "policy" or "custom" that caused the plaintiff's injuries. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Sorlucco v. N.Y. City Police Dep't*, 971 F.2d 864, 870 (2d Cir.1992); *Bullard v. City of New York*, 240 F.Supp.2d 292, 299–300 (S.D.N.Y.2003). The plaintiff must demonstrate that the municipality was the "moving force" behind the injuries alleged. *Brown*, 520 U.S. at 404, 117 S.Ct. 1382; *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. The alleged policy does not need to be contained in an explicitly adopted rule so long as the unlawful practices of city officials are so "persistent and widespread . . . as to constitute a custom or usage with the force of law." *Sorlucco*, 971 F.2d at 870–71 (citation and internal quotation marks omitted); *see*

*also Munoz v. City of New York,* No. 04cv1105, 2008 WL 464236, at *3 (S.D.N.Y. Feb. 20, 2008).

■ The claims against the City must be dismissed because the plaintiff has submitted no evidence that any municipal policy or custom was the moving force behind the plaintiff's arrest or prosecution. The plaintiff alleges that Defendant Perez's mistaken belief that the building at 105 Charles Street was part of the "Trespass Affidavit Program" caused Perez to use boilerplate language in the criminal complaint that otherwise would not have been included. However, with respect to the false arrest claim, any such policy could not have been the moving force behind the alleged constitutional deprivation because the plaintiff's arrest occurred prior to the filing of the criminal complaint. *See Jones v. Town of East Haven,* 691 F.3d 72, 80–81 (2d Cir.2012) ("It is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (citation and emphasis omitted)). Moreover, there is no evidence in the record from which to infer that there was any policy of providing false information in criminal complaints, or that the use of form complaints was the moving force behind the plaintiff's prosecution. *See, e.g., Bowen v. Cnty. of Westchester,* 706 F.Supp.2d 475, 488 (S.D.N.Y.2010) ("[A] single instance of employee misconduct does not state a *Monell* claim." (collecting cases)). Accordingly, the claims against the City must be dismissed.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the foregoing reasons, the defendants' motion for summary judgment dismissing all causes of action in the Complaint is **granted**. The Clerk is directed to **close all pending motions.** to **enter Judgment,** and to **close this case.**

**SO ORDERED.**